**In re STONE & WEBSTER, INCORPORATED, et al., Debtors.**

No. 00–02142 PJW.

United States Bankruptcy Court, D. Delaware.

Nov. 14, 2002.

Adam G. Landis, Kathleen P. Makowski, Klett Rooney Lieber & Schorling, Wilmington, DE, Anthony Princi, Lorraine McGowen, Orrick, Herrington & Sutcliffe LLP, New York City, James E. Houpt, Lynn Trinka Ernce, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA, Co–Counsel to the Official Committee of Unsecured Creditors.

Gregg M. Galardi, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, for Debtors and Debtors–in–Possession.

Ian Connor Bifferato, Megan N. Harper, Bifferato, Bifferato & Gentilotti, Wilmington, DE, David F. Heroy, Michael F. Yetnikoff, Carmen H. Lonstein, Bell, Boyd & Lloyd LLC, Chicago, IL, Counsel to the Official Committee of Equity Security Holders of Stone & Webster, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court is a motion for summary judgment (Doc. # 2856) ("Summary Judgment Motion") filed by the Official Committee of Equity Security Holders ("Equity Committee") in response to a motion for substantive consolidation (Doc. # 1900) ("Consolidation Motion") filed by the Official Committee of Unsecured Creditors ("Creditors' Committee"). For the reasons set forth below, the Summary Judgment Motion will be denied and the Consolidation Motion will be granted in part.

## BACKGROUND

Stone & Webster, Incorporated ("SWINC") and 72 direct and indirect subsidiaries filed voluntary Chapter 11 petitions on June 2, 2000. The Chapter 11 cases were consolidated for administrative purposes. Prior to the commencement of the Chapter 11 cases, SWINC and its subsidiaries were engaged in providing professional engineering, construction, and consulting services worldwide. Additionally, certain subsidiaries owned and operated cold storage warehouses in the United States.

More specifically, SWINC is a Delaware corporation that exists as a holding company, owning, directly or indirectly, the 72 affiliated debtors in this case, and having no other function. SWINC also owns, directly or indirectly, 25 non-debtor entities organized under foreign laws and operating outside the United States. Directly, SWINC owns Stone & Webster Engineers & Constructors, Inc. ("SWE & C"), which directly owns Stone & Webster Engineer-ing Corporation ("SWEC"). SWE & C is primarily a holding company owning, directly or indirectly, the various engineering companies in the SWINC empire. SWEC is the principal operating subsidiary.

On July 17, 2000, SWINC sold virtually all its assets to a designee of the Shaw Group, Inc. ("Shaw") for cash and an assumption of virtually all of SWINC's ordinary course trade debt and balance sheet liabilities. SWINC's remaining assets consist of the following: its share of the proceeds from the Shaw sale, certain project contracts excluded from the Shaw sale, receivables related to completed or substantially completed contracts, litigation causes of action, stock in certain subsidiaries, and SWINC's interest in its pension plan.

On August 10, 2001, the Creditors' Committee filed a proposed plan (Doc. # 1902) (the "Plan") that calls for substantive consolidation of SWINC and its 72 direct and indirect subsidiaries into one estate.

With the filing of its Plan the Creditors' Committee filed its Consolidation Motion, which asks this Court to conclude that the applicable tests governing substantive consolidation are satisfied. In that motion, the Creditors' Committee sets forth the following factual bases for its position that substantive consolidation is appropriate.[1]

(1) Though each Debtor maintained separate books and records for internal purposes, financial reporting was done on a consolidated basis. Additionally, there was a sharing of assets such as computer software and engineering tools for which the customer was not separately billed by

---

1. I recognize that the Equity Committee disputes the Creditors' Committee's version of the consolidation facts and/or the conclusion to be drawn therefrom. I list them here solely to put the Creditors' Committee's Plan and Consolidation Motion in context and do not necessarily adopt any or all of these factual assertions. As discussed below, this is a matter for later determination.

the entity whose assets were used. SWINC also guaranteed most of the other Debtors' major construction projects, making the existence of the subsidiaries dependent on an affiliation with SWINC.

(2) Over 17% of the proofs of claims filed in this case appear to be duplicates, filed against SWINC and one or more of its co-debtors. The Creditors' Committee believes this indicates creditors do not know which Debtor is responsible for satisfying their claims. Further, over 25% of the proofs of claims were filed by employees seeking back wages. Most were filed against the Debtor for whom the employee worked and SWINC, or solely against SWINC. Letters to employees regarding compensation or benefits were sent on SWINC letterhead with, at most, a stamp at the bottom of the page identifying the affiliated entity.

(3) Utility services were shared by the Debtors and only six of the 73 had contracts with utility companies. There was also shared management as each affiliated entity's board of directors was either partially or wholly composed of SWINC employees, officers, or directors. In-house legal and treasury services were performed for all Debtors by SWINC's legal and treasury departments. Office space was also shared.

(4) A consolidated cash management system was in place, which led to cash flowing freely, at SWINC's discretion, between Debtors in accordance with their needs. Rather than each Debtor having its own bank account, there were only a small number of accounts, leading to intermingling of funds. Finally, the proceeds from the Shaw sale were never allocated to each Debtor purchased.

On September 7, 2001, creditor Marine Yankee Atomic Power Co. filed objections to the Consolidation Motion and to the Plan. The objections are based, in part, on the assertion that substantive consolidation is no longer an available remedy to bankruptcy courts in light of the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., et al.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). One week later, the Equity Committee filed a competing proposed plan. That plan would treat SWINC and each of its subsidiary debtors as separate, non-consolidated entities.

SWINC filed its proposed plan on March 15, 2002. The plan filed by SWINC proposes the substantive consolidation the debtors into two estates, one consisting of SWINC and certain of its affiliates and subsidiaries, and the other consisting of SWE & C and SWEC and the remaining affiliates and subsidiaries.[2] On May 29, 2002, the Equity Committee filed its Summary Judgment Motion requesting that this Court hold that *Grupo Mexicano* prohibits a bankruptcy court from ordering substantive consolidation, rendering the plans proposed by the Creditors' Committee and SWINC non-confirmable.

Whether substantive consolidation ultimately takes place in this case has a significant impact on the creditors. According to the Creditors' Committee, under the Equity Committee's plan, SWINC's creditors will enjoy a 100% recovery and its shareholders will receive in excess of $3 per share while SWEC's creditors will receive no more than 7 cents on the dollar. With substantive consolidation, creditors of all debtors will receive significant recovery from aggregated estates.

The Equity Committee's Summary Judgment Motion has resulted in extensive

**2.** The Equity and Creditors' Committees and SWINC have each filed amended plans.

However, none of the amendments are relevant to the issue before this Court.

briefing not limited to the Equity Committee and the Creditors' Committee. SWINC and creditor Federal Insurance Company have also submitted briefs in opposition to the Equity Committee's position.[3]

## DISCUSSION

### *Legal Standard for Summary Judgment and the Committees' Positions*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Therefore, the Equity Committee bears the initial burden of demonstrating the absence of material issues of fact. *Id.* When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could not lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Summary Judgment Motion does not rely on the particular facts of these Debtors' affairs. Instead, the Equity Committee asserts that summary judgment should be granted because as a matter of law this Court is without authority to order the remedy of substantive consolidation as a result of the Supreme Court's decision in *Grupo Mexicano*. The Equity Committee states its position as follows:

> In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), the Supreme Court held that, in the absence of a specific statute expanding the court's jurisdiction, a U.S. district court's equitable power is limited to granting remedies actually administered by the English Chancery Courts in the late 18th Century. None of the Respondents articulates a statutory or historical basis for a bankruptcy court to grant substantive consolidation as sought by the Creditors' Committee in the Consolidation Motion. Absent such a basis, substantive consolidation cannot be granted.[4]

Equity Committee's Amended Reply (Doc. # 3214), p. 1.

In response, the Creditors' Committee argues that "the functional equivalent of substantive consolidation in bankruptcy, and numerous similar remedies in non-bankruptcy cases, were quite familiar to

---

**3.** The briefing on the substantive consolidation issue includes the following: Creditors' Committee's Motion for Substantive Consolidation, Doc. # 1900 and Memorandum of Law in Support of Motion, Doc. # 1901; Equity Committee's Motion for Summary Judgment and Memorandum of Law in Support of Motion, Doc. # 2856; Pension Benefit Guaranty Corp.'s Response to Motion of Equity Committee and Cross–Motion for Partial Summary Judgment, Doc. # 2913; Debtors' Response to Equity Committee's Motion for Summary Judgment, Doc. # 2987; Creditors' Committee's Opposition to Equity Committee's Motion for Summary Judgment, Doc. # 2988; Federal Insurance Co.'s Response to and Objection to Equity Committee's Motion for Summary Judgment, Doc. # 2991; and Equity Committee's Amended Reply, Doc. # 3214.

**4.** The Equity Committee's position is not limited to the equity jurisdiction argument based solely on *Grupo Mexicano.* However, for the reasons discussed hereinafter I need not address those other arguments.

the English Court of Chancery in 1789." Creditors' Committee Opposition (Doc. # 2988), p. 2.

The Equity Committee and the Creditors' Committee have engaged in a heavy exchange of case citations and commentaries dealing with 18th Century English law in support of their respective positions. Both Committees retained respected academicians to research and explain the old authorities and relate them to 21st Century commercial jurisprudence. The debate between the two Committees is essentially whether the *Grupo Mexicano's* holding regarding the 18th Century equitable powers limitation on the district court applies the substantive consolidation remedy in a bankruptcy court. While I find this exercise interesting, I do not believe it is necessary for me to discourse on those old authorities to decide the matter before me.

***The Grupo Mexicano Decision and Bankruptcy Code Section 105***

In *Grupo Mexicano,* the Supreme Court held that federal courts do not have authority to grant provisional remedies pursuant to Fed.R.Civ.P. 65 to potential creditors who have not received judgments against a defendant. 527 U.S. at 333, 119 S.Ct. 1961 ("Because such a remedy was historically unavailable from the court of equity, we hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages.").

There, a Mexican company subject to jurisdiction in the United States announced it planned to use valuable notes it was about to receive from the Mexican government to pay off Mexican creditors, leaving nothing for American creditors. *Id.* at 311–12, 119 S.Ct. 1961. The American creditors filed suit in the district court requesting breach of contract damages and a preliminary injunction restraining the Mexican debtor from transferring its right to the notes to its Mexican creditors. *Id.* at 312, 119 S.Ct. 1961. Recognizing the American creditors' predicament, the district court granted a preliminary injunction enjoining the defendant from transferring its right to the notes. *Id.* at 312–13, 119 S.Ct. 1961. The United States Court of Appeals for the Second Circuit affirmed, and on subsequent appeal, the Supreme Court reversed. *Id.* at 313, 119 S.Ct. 1961.

Justice Scalia, writing for the majority, held that the district court lacked authority to grant a pre-judgment remedy to potential creditors pending determination of those creditors' claims against the defendant. Noting the "well established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property," *Id.* at 321, 119 S.Ct. 1961, the Supreme Court held that the district court could not issue the injunction. *Id.* at 333, 119 S.Ct. 1961.

In reaching that conclusion, the majority reasoned that because such a remedy was neither specifically authorized by statute nor an equitable remedy administered by courts of equity at the time of the enactment of the Judiciary Act of 1789, it was not proper to issue the pre-judgment injunction. *Id.* at 332–33, 119 S.Ct. 1961. From this the Equity Committee argues that because substantive consolidation is neither specifically authorized by statute nor an equitable remedy administered by courts of equity at the time the Judiciary Act was enacted, this Court lacks the power to substantively consolidate the Debtors' estates.

In my view, it seems highly doubtful that the holding of *Grupo Mexicano* controls the issue here. In *Grupo Mexicano,* the Supreme Court held that federal courts do not have the power under Fed.

R.Civ.P. 65 to issue preliminary injunctions that would prevent a defendant, pending adjudication of a plaintiff's contract claims, from disposing of its assets. 527 U.S. at 332–33, 119 S.Ct. 1961. That holding has nothing to do with substantive consolidation or the authority of a bankruptcy court to grant the remedy of substantive consolidation.

Equally important, in *Grupo Mexicano,* the majority opinion strongly suggests that bankruptcy law provides a court with authority to grant remedies not administered by courts of equity at the time of the enactment of the Judiciary Act. Specifically, as Justice Scalia's opinion expressly states:

> When there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than we both to perceive them and to design the appropriate remedy. Despite [the dissent's] allusion to the "increasing complexities of modern business relations," and to the bygone "age of slow-moving capital and comparatively immobile wealth," we suspect there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others– or even about their seeking to achieve these ends through "sophisticated strategies." **The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; and equitable power to restrict a debtor's use of his unencumbered property before judgment was not.**

*Id.* at 322, 119 S.Ct. 1961 (emphasis added) (internal citations omitted).

Furthermore, the Court emphasized that the type of injunction sought, a "Mareva Injunction," was a form of relief not previously available and was the type of relief "specifically disclaimed by longstanding judicial precedent." *Id.* at 322, 119 S.Ct. 1961. In discussing such relief, the Supreme Court noted that a Mareva Injunction was a dramatic departure from prior practice and a remedy not exercised by courts of equity until 1975. *Id.* at 327, 119 S.Ct. 1961. This is not the case with the remedy of substantive consolidation.

The remedy of substantive consolidation was recognized by the Supreme Court as early as 1941. *See Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941) (in upholding consolidation, noting that "power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete"). Moreover, its roots extend to at least as far back as the Bankruptcy Act of 1898, and nothing in the Bankruptcy Code or case law suggests that the remedy is not available today. *In re Bonham,* 229 F.3d 750, 765 (9th Cir.2000) ("[E]ven though substantive consolidation was not codified in the statutory overhaul of bankruptcy law in 1978, the equitable power undoubtedly survived enactment of the Bankruptcy Code. No case has held to the contrary.").

Substantive consolidation was fashioned as a device to combat the commission of fraud upon creditors. *In re Bonham,* 226 B.R. 56, 77 (Bankr.D.Alaska 1998), *aff'd,* 229 F.3d 750 (9th Cir.2000) (performing a detailed analysis of the history of substantive consolidation). Substantive consolidation was also used as a practical device where the identity of assets and liabilities of separate entities were badly intermingled by poorly kept accounting records, disregard of corporate formalities and careless business practices in general. *Id.*

Under the former Bankruptcy Act, the authority to order substantive consolidation was implied from the general equity powers of the bankruptcy court. *See Pep-*

per v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity"). In 1941, the Supreme Court gave its tacit approval to this equitable power to substantively consolidate two estates. Sampsell, 313 U.S. at 219, 61 S.Ct. 904. Early decisions in the corporate context applied essentially an alter ego or pierce the corporate veil test in assessing the propriety of substantive consolidation. See, e.g., Fish v. East, 114 F.2d 177 (10th Cir.1940); Stone v. Eacho, 127 F.2d 284 (4th Cir.1942), cert. denied, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942) (court approved substantive consolidation of a non-debtor which was a mere "instrumentality" of the debtor).

■■■ Furthermore, under the Bankruptcy Code, the power to substantively consolidate is arguably derived from the bankruptcy court's general equitable powers as provided in Bankruptcy Code section 105(a). 11 U.S.C. § 105(a).[5] See Bonham, 229 F.3d at 764–65 (tracing the historical development of substantive consolidation and reaffirming its validity subsequent to the enactment of the current Bankruptcy Code). As this Court has recently observed, " '[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors.' " In re Genesis Health Ventures, Inc., 266 B.R. 591, 618 (Bankr.D.Del.2001) (quoting In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir.1988)). Given this overarching consideration, the bankruptcy court has great flexibility to tailor its relief to ensure the equitable treatment of · all creditors. See, e.g., In re Giller, 962 F.2d 796, 799 (8th Cir.1992) ("[T]he bankruptcy court re-

tains the power to order a less than complete consolidation").

The Advisory Committee for the Bankruptcy Rules also believed that substantive consolidation was readily available under the Bankruptcy Code. In discussing Bankruptcy Rule 1015, which authorizes the joint administration of estates, the 1983 Advisory Committee Note thereunder states:

> Consolidation of the estates of separate debtors may sometimes be appropriate, as when the affairs of an individual and a corporation owned or controlled by that individual are so intermingled that the court cannot separate their assets and liabilities. Consolidation, as distinguished from joint administration, is neither authorized nor prohibited by this rule since the propriety of consolidation depends on substantive considerations and affects the substantive rights of the creditors of different estates. For illustrations of the substantive consolidation of separate estates, see Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215 [61 S.Ct. 904] (1941). See also Chemical Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845 (2d Cir.1966); ...Kennedy, Insolvency and the Corporate Veil in the United States in Proceedings of the 8th International Symposium on Comparative Law 232, 248–55 (9171).

Fed. R. Bankr.P. 1015 Advisory Committee's Note.

While Bankruptcy Rule 1015 is not a source of authority for imposing substantive consolidation, the Advisory Committee nevertheless clearly acknowledged that substantive consolidation had been discussed, debated, considered and allowed

---

**5.** Bankruptcy Code section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Bankruptcy Code, 11 U.S.C. §§ 101 et seq., is hereinafter referred to as " § _____."

by courts in the bankruptcy context for more than half a century.

This has not changed since the *Grupo Mexicano* decision was handed down. While courts post-*Grupo Mexicano* have applied the holding to cases involving injunctive relief, there are no published opinions interpreting *Grupo Mexicano* to hold that substantive consolidation is no longer available as a remedy in bankruptcy cases. At least one court has held that *Grupo Mexicano* is not applicable to cases involving substantive consolidation. *See, Official Committee of Asbestos Claimants v. G–I Holdings, Inc. (In re G–I Holdings, Inc.),* 2001 WL 1598178, at \*7 (Bankr.D.N.J. 2001) (court recognized the standing of creditors' committee to move for substantive consolidation and court's authority to order it notwithstanding *Grupo Mexicano*). Moreover, numerous courts have granted substantive consolidation after the Supreme Court's decision in *Grupo Mexicano,* including this Court. *See In re GC Companies, Inc.,* 274 B.R. 663 (Bankr. D.Del.2002) (allowing substantive consolidation of debtors' estates although not on a *nunc pro tunc* basis); *Genesis,* 266 B.R. at 591 (authorizing substantive consolidation after applying factors used by the D.C. Circuit in *In re Auto–Train Corp., Inc.,* 810 F.2d 270 (D.C.Cir.1987)).

I seriously doubt that the above discussed longstanding judicial precedent has been overruled by *Grupo Mexicano.* As one court addressing the affect of *Grupo Mexicano* on substantive consolidation noted:

> I think the point well made is that there is other Supreme Court authority which has heretofore recognized the ability of a bankruptcy court to order substantive consolidation, including the *Sampsell* decision which I don't believe was directly overruled by the *Groupo* [sic] *Mexicano* case.

*Official Committee of Asbestos Claimants v. G–I Holdings, Inc. (In re G–I Holdings, Inc.),* Adv. No. 01–3065(RG) (Bankr.D.N.J. March 12, 2001), March 12, 2001 Hearing Transcript at 71–72.

The Equity Committee argues that the substantive consolidation remedy cannot be ordered by virtue of a "general equity power" granted to bankruptcy courts by § 105. It asserts that the Supreme Court rejected that argument in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), holding that § 105 may be used only in furtherance of a specific provision of the Bankruptcy Code, not to create substantive rights. Further, the Equity Committee argues that § 105 cannot provide an independent basis for creating a "federal doctrine" of substantive consolidation because such law-making power would violate Article I of the United States Constitution, even if it were delegated by Congress. It cites the doctrine of *Erie v. Tompkins* as prohibiting the development of an independent substantive federal common law such as the supposed "federal doctrine" of substantive consolidation.

In reaching my conclusion today I do not have to determine whether *Grupo Mexicano's* limitation on the equitable remedies administered by district courts has application here, or whether the broad mandate of § 105's general equity powers of a bankruptcy court provide sufficient bases for substantive consolidation. Contrary to what some of the reported cases say and what the Creditors' Committee says, I find clear statutory authority in the Bankruptcy Code for substantive consolidation in Chapter 11 cases.

### Bankruptcy Code Section 1123(a)(5)(C).

■ Although not expressed as "substantive consolidation", the Bankruptcy Code recognizes that, in appropriate cir-

cumstances, consolidation of one debtor with one or more debtors is authorized. Specifically, § 1123(a)(5) provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

\* \* \* \* \* \*

(5) provide adequate means for the plan's implementation, such as—

\* \* \* \* \* \*

(C) merger or consolidation of the debtor with one or more persons...

11 U.S.C. § 1123(a)(5)(C).[6]

In using the phrase "one or more persons", § 1123(a)(5)(C) obviously means that pursuant to § 101(13) a "person" can be a "debtor." Courts have held that this provision of the Bankruptcy Code indicates Congress' intent that a chapter 11 debtor may merge or consolidate with other entities, including other debtors, as part of the reorganization process. *See In re Affiliated Foods, Inc.,* 249 B.R. 770, 777 (Bankr. W.D.Mo.2000) (substantively consolidating debtor estates); *In re Limited Gaming of America, Inc.,* 228 B.R. 275, 287 (Bankr. N.D.Okla.1998) (same). Because substantive consolidation is expressly authorized by statute, *viz.* § 1123(a)(5)(C), the decision of *Grupo Mexicano* cannot be read to prohibit consolidation in the plan formulation and confirmation process in a Chapter 11 case.

While the Equity Committee acknowledges that § 1123(a)(5)(C) allows merger or consolidation of two or more debtors, it asserts that "[m]erger or consolidation is permitted only pursuant to a confirmed plan and in accordance with applicable state law." (p. 44). The Equity Committee's first point is technically correct but of no practical consideration at this point in the case; its second point is plainly wrong.

The Equity Committee offers three arguments for why § 1123(a)(5)(C) should not serve as the basis for the substantive consolidation provision of the Plan.

First, while the Equity Committee agrees that § 1123(a)(5) provides that a plan may provide for merger or consolidation as a means for a plan's implementation, it argues that the section does not confer upon the bankruptcy court the authority to *order* substantive consolidation. I have some difficulty understanding this position of the Equity Committee. As further articulated in its Amended Reply, the Equity Committee states that

"granting substantive consolidation of the Debtors outside a confirmable plan of reorganization not only would deprive creditors and shareholders of their statutory right to vote on a plan that would radically restructure their substantive rights, it also would preclude the possibility of alternative methods of reorganization, such as those proposed by the Debtor's plan and the Equity Committee's plan. For this reason alone, the Summary Judgment Motion should be granted and the Consolidation Motion denied."

Equity Committee's Amended Reply (Doc. # 3214), pp. 45–46.

I do not view the Creditors' Committee's Consolidation Motion as seeking an order from this Court directing that any plan submitted by the Creditors' Committee or anybody else must contain a substantive consolidation provision. I view the Creditors' Committee's Consolidation Motion as a request for the Court to make a determination that as an element of the Plan the substantive consolidation provision is au-

---

6. There is scant legislative history as to this provision but it essentially mirrors § 216(10) of the Bankruptcy Act. 7 *Collier on Bankruptcy* ¶ 1123.LH[4], 1123–29 (15th ed.2002).

thorized *and* on the facts of these Chapter 11 cases is appropriate and warranted.

While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan. I view the Creditors' Committee's Consolidation Motion as such a request. The Creditors' Committee could have elected to not file the Consolidation Motion and simply wait for the Plan confirmation hearing to have the substantive consolidation issue resolved—either by Plan confirmation or denial of Plan confirmation. The Consolidation Motion merely seeks a pre-confirmation hearing determination that the substantive consolidation provision in the Creditors' Committee's Plan is proper. It seems clear that at this juncture of these Chapter 11 cases the Court has the authority to rule on the Consolidation Motion. Section 105(a) authorizes a court to "issue any order … that is necessary or appropriate to carry out the provisions of this title." Section 1123(a)(5)(C) is clearly such a provision of Title 11.

As I view it, there are two elements to the Creditors' Committee's Consolidation Motion, one seeks a determination that substantive consolidation is allowable in a Chapter 11 plan such as that proposed by the Creditors' Committee, the other seeks a determination that the facts of these Chapter 11 cases warrant substantive consolidation based upon the numerous factors which the bankruptcy courts are required to consider, such as those discussed on pages 3–5 above. As to the first element I see no practical difference between a plan proponent seeking a ruling in advance of a confirmation hearing, versus seeking a ruling as a part of the confirmation hearing, that substantive consolidation is allowable in a Chapter 11 plan. Consequently, it is my ruling that substantive consolidation such as that proposed by the Plan is, by reason of § 1123(a)(5)(C), clearly an allowable provision in a Chapter 11 plan.[7] Of course, this ruling does not (a) address the issue of whether the facts of these Chapter 11 cases warrant the use of the substantive consolidation provision as an appropriate means for implementing the Plan or that the Plan is confirmable; (b) deprive any claimant or interest holder of their right to vote for or against the Plan or to otherwise participate in the confirmation process; or (c) in any way

7. I note that while section 10.4 of the Plan provides that "each of the Subsidiary Debtors shall be deemed merged with and into SWINC", other portions of Article X of the Plan dealing with the substantive consolidation speak in terms of consolidating "the Debtors' Estates and the Bankruptcy Cases for the purpose of all actions associated with confirmation and consummation of the Plan." (Section 10.2). Some plans in other cases before this Court, as does SWINC's plan, express substantive consolidation solely in terms of consolidation of estates rather than consolidation of debtor entities, suggesting a consolidation involving something short of what one normally understands as a conventional corporate consolidation under state corporation law. To the extent that may be so, I do not view § 1123(a)(5)(C) as intending to make a distinction between consolidating debtor entities and consolidating debtor estates. Certainly, there is nothing in § 1123 to suggest that the term "consolidation" is limited to a consolidation of corporate entities that outside of bankruptcy could only be structured as provided in the state corporation law. In any event, to the extent the concepts are distinguishable the issue is easily resolved by reference to § 1123(b)(6) which permits a plan to "include any other appropriate provision not inconsistent with the applicable provisions of this title." If anything, consolidation of debtors' estates would encompass less than a conventional non-bankruptcy law corporate consolidation, so that consolidation of debtors' estates would not be inconsistent with the express authorization of § 1123(a)(5)(C).

preclude any other proponent of a different plan from seeking approval of such plan which does not contain a substantive consolidation provision, such as the Equity Committee's plan, or a plan which contains only a partial consolidation provision, such as SWINC's plan.

Second, according to the Equity Committee, in addition to the plan confirmation requirements of § 1129, a plan must also be in "accordance with the substantive requirements of state law, *with respect to each of the 73 Debtors. See, e.g.,* Del.Code Ann. Tit.8 §§ 251, 252, and 253 (providing for voluntary mergers upon proper approval subject to fiduciary obligations to the corporations' shareholders." Equity Committee Amended Reply (Doc. # 3214), p. 44). The Equity Committee further articulates its position as follows:

"Section 1123(a)(5)(C) provides the exclusive method for achieving merger or consolidation in bankruptcy—pursuant to a plan confirmed in accordance with applicable bankruptcy requirements as to each of the Debtors and in accordance with applicable state law. This method clearly contemplates a democratic process whereby creditors' substantive rights under general corporate law are compromised only by consent or in accordance with state corporate law."

Equity Committee's Amended Reply (Doc. # 3214), p. 46.

■ I do not agree with the Equity Committee's position regarding compliance with state law, including the Delaware General Corporation Law. Section 1123(a) unequivocally states that the provisions which a plan shall contain is "[n]otwithstanding any otherwise applicable nonbankruptcy law." The quoted language clearly means, and case law so holds, that the provisions of a plan as articulated in § 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law,

including the corporation law of the State of Delaware or any other state corporation laws having bearing on the debtors. 7 *Collier on Bankruptcy* ¶ 1123.LH[4], p. 1123–27 (15th ed. rev.2002). *See e.g. Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.),* 853 F.2d 1149, 1154 (4th Cir.1988)(holding § 1123(a)(5)(D) overrides non-bankruptcy law "[b]y its plain language."); *In re Pacific Gas & Electric Co.,* 283 B.R. 41,47 (N.D.Cal.2002) ("a review of the text and legislative history of [§ 1123(a) ] demonstrates that Congress intended expressly to preempt non-bankruptcy laws that would otherwise apply to bar, among other things, transactions necessary to implement the reorganization plan.").

The sections of the General Corporation Law of the State of Delaware cited by the Equity Committee address the required procedures, including board of director and shareholder participation, for merger or consolidation of domestic corporations (8 Del. C. § 251), for merger or consolidation of domestic and foreign corporations (8 Del. C. § 252), and for parent and subsidiary mergers (8 Del. C. § 253). It certainly seems clear from the "[n]otwithstanding any otherwise applicable nonbankruptcy law" language of § 1123(a) that the Bankruptcy Code overrides the requirements of these provisions of the Delaware General Corporation Law. If there is any doubt about the Bankruptcy Code trumping these state law provisions, 8 Del. C. § 303 dispels it. Subsection (a) and (b) of § 303 of the General Corporation Law of the State of Delaware provide in relevant part as follows:

(a) Any corporation of this State, *a plan of reorganization* of which, *pursuant to any applicable statute of the United States relating to reorganizations of corporations,* has been or shall be con-

firmed by the decree or order of a court of competent jurisdiction, *may put into effect and carry out the plan* and the decrees and orders of the court or judge relative thereto and may take any proceeding and do any act provided in the plan or directed by such decrees and orders, *without further action by its directors or stockholders.* Such power and authority may be exercised, and such proceedings and acts may be taken, as may be directed by such decrees or orders, by the trustee or trustees of such corporation appointed in the reorganization proceedings (or a majority thereof), or if none be appointed and acting, by designated officers of the corporation, or by a Master or other representative appointed by the court or judge, *with like effect as if exercised and taken by unanimous action of the directors and stockholders of the corporation.*

(b) *Such corporation may, in the manner provided in subsection (a) of this section*, but without limiting the generality or effect of the foregoing, . . . *merge or consolidate as permitted by this chapter* . . . (Emphasis added.)

8 Del. C. § 303(a) and (b) (emphasis added).

■ Finally, the Equity Committee argues that the Plan with its consolidation provision, should not be allowed to go forward because the Plan cannot satisfy the "best interests test" of § 1129(a)(7). The Equity Committee states its position as follows:

[A] plan may not be confirmed unless it meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, which requires that creditors receive at least the same as they would receive in a chapter 7 liquidation. With respect to parent company SWINC, no plan providing for full or partial consolidation could ever meet this requirement because SWINC creditors would receive less than 100% in any consolidated scenario whereas they otherwise would be paid in full in a non-consolidated scenario.

Equity Committee's Amended Reply (Doc. # 3214), p. 45.

The clear implication of this argument is that in applying the § 1129(a)(7) test, one must proceed with the chapter 7 analysis premised on "a non-consolidated scenario." I do not agree with that implication.

I do not believe that the § 1129(a)(7) confirmation issue is ripe for determination at this juncture. The appropriate time to address it is at plan confirmation time if a substantive consolidation plan reaches that juncture in the case. Nevertheless, in anticipation of that possibility I briefly comment on some of the problems I see with the Equity Committee's position on § 1129(a)(7).

In my view the Equity Committee's approach to the best interest test results in a classic "apples and oranges" comparison. Pursuant to § 1129(a)(7), every member of each impaired class must either (1) accept the plan or (2) receive under the plan not less than such member would receive in a chapter 7 liquidation. Question: what Chapter 7 liquidation? Is it one based on the same claims and interests classifications in the subject plan or some different claims and interests classifications? The Equity Committee posits the later. I do not believe that is necessarily so.

■ The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan. A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders

would receive in a "hypothetical Chapter 7 distribution" to those classes. 7 *Collier on Bankruptcy* ¶ 1129.03[7][b], p. 1129–43 (15th ed. rev.2002). When a particular plan calls for substantive consolidation of two or more debtors the liquidation and the distribution analysis called for by § 1129(a)(7) arguably must follow the same class scheme as that plan. For example, if under a particular substantive consolidation plan class X contains 100 creditors, each of whom has a claim only as against one of five different debtors, a § 1129(a)(7) analysis arguably should not test how each of those 100 creditors would be treated in a theoretical stand alone liquidation of their respective debtor. It is difficult to conceive of how this analysis could be done if there is a legitimate basis for the substantive consolidation in the first place based on such factors as intercompany advances and guarantees, commingling of assets, combined business functions, and consolidated financials.[8]

Furthermore, if the individual holder of a claim or interest in a class pursuing an individual debtor analysis could be done and the subject plan, with a legitimate basis for substantive consolidation, failed the § 1129(a)(7) test then the purpose and benefit of the substantive consolidation would be lost. There would be a fundamental conflict between § 1123(a)(5)(C) (the means to implement the plan) and § 1129(a)(7) (a condition to plan confirmation).

Section 1129(a)(7) speaks in terms of treatment of "each impaired class" as defined in the subject plan and the treatment of "each holder of a claim or interest in such class". The Equity Committee's approach does not compare the treatment of creditors and interest holders in the specified classes of the Plan with creditors and interest holders in those same classes in a hypothetical Chapter 7 liquidation. Rather, it compares the treatment of creditors and interest holders in the specified classes of the Plan with creditors and interest holders in different classes in a hypothetical Chapter 7 liquidation. It seems doubtful that that is what Congress intended by the § 1129(a)(7) test.

■ Section 1129(a)(7) "is an individual guaranty to each creditor or interest holder that it will receive at least as much in *reorganization* as it would in *liquidation*." 7 *Collier on Bankruptcy* ¶ 1129.03[7][b] p. 1129–43 (15th ed. rev.2002) (emphasis added). "Paragraph (7) of subsection 1129(a) requires a *comparison* between what each member of a class will receive under a *plan* and what such claimant would receive in *liquidation*." 7 *Collier on Bankruptcy* ¶ 1129.03[7][c] p. 1129–48 (15th ed. rev. 2002) (Emphasis added). Thus, if a plan fails the § 1129(a)(7) test then the creditors are better off in a liquidation. But the Creditors' Committee's Plan is a liquidation plan. In this context the application of § 1129(a)(7) is problematic.[9]

If this Court determines that substantive consolidation is warranted; i.e., in the best interest of "equality of distribution" (*Sampsell*, 313 U.S. at 219, 61 S.Ct. 904), then it would seem to follow that the hypothetical chapter 7 analysis should also be done on a substantive consolidation basis. Section 105(a)'s authority "to issue any

---

8. The Court has not yet examined the facts of this case bearing upon the numerous commingling factors which courts consider in determining whether substantive consolidation is warranted. Whether substantive consolidation is warranted in the Plan may require an evidentiary hearing.

9. In this regard I note that Chapter 11 of the Bankruptcy Code simply refers to a "plan", with no use of the words "reorganization plan" or "liquidation plan."

order, process or judgment that is necessary or appropriate to carry out the provisions of this title" certainly seems to empower this Court to so provide. Stated differently, if a bankruptcy court determines pursuant to § 1123(a)(5)(C) that substantive consolidation is warranted for a particular Chapter 11 plan, how can the § 1129(a)(7) comparison be done if the hypothetical chapter 7 liquidation is not also done on a substantive consolidation basis?

### CONCLUSION

For the reasons discussed above, I find that § 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a Chapter 11 plan containing a provision which substantively consolidates the estates of the two or more debtors. Consequently, the Equity Committee Summary Judgment Motion requesting a contrary finding must be denied. Whether a substantive consolidation provision in a particular plan, such as the Creditors' Committee's Plan, is warranted by the facts of this case remains for later determination.