

Opinions of the United
States Court of Appeals
for the Third Circuit

8-15-2005

# In Re: Owens Corning

Precedential or Non-Precedential: Precedential

Docket No. 04-4080

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re: Owens Corning " (2005). *2005 Decisions.* Paper 605.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/605

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No.  04-4080

———————

IN RE: OWENS CORNING, a Delaware Corporation

CREDIT SUISSE FIRST
BOSTON, as Agent for the
prepetition bank lenders,

Appellant

———————

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 00-cv-03837)
District Judge: Honorable John P. Fullam

———————

Argued February 7, 2005

Before: ROTH, AMBRO and FUENTES, <u>Circuit Judges</u>

(Filed August 15, 2005)

Martin J. Bienenstock, Esquire (Argued)
John J. Rapisardi, Esquire

Richard A. Rothman, Esquire
Timothy E. Graulich, Esquire
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 27th Floor
New York, NY 10153

Ellen R. Nadler, Esquire
Jeffrey S. Trachtman, Esquire
Kenneth H. Eckstein, Esquire
Philip S. Kaufman, Esquire
Kramer, Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Roy T. Englert, Jr. Esquire
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411
Washington, DC 20006

Rebecca L. Butcher, Esquire
Adam G. Landis, Esquire
Richard S. Cobb, Esquire
Landis, Rath & Cobb LLP
919 Market Street
Suite 600, P.O. Box 2087
Wilmington, DE 19899
*Counsel for (Appellant) Credit Suisse First Boston Corp., as Agent for the prepetition bank lenders*

Alexandra A.E. Shapiro, Esquire
Mitchell A. Seider, Esquire

2

Alan Leavitt, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4802

Amanda P. Biles, Esquire
Latham & Watkins LLP
Two Freedom Square
11955 Freedom Drive, Suite 500
Reston, Virginia   20190-5651
        *Counsel for (Amicus-appellants) The Loan*
        *Syndications and Trading Association, Inc. and*
        *Clearing House Association L.L.C.*

Richard M. Kohn, Esquire
Andrew R. Cardonick, Esquire
Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz Ltd.
55 East Monroe Street, Suite 3700
Chicago, IL   60603

Jonathan N. Helfat, Esquire
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY   10169
        *Counsel for (Amicus-appellant) Commercial Financial*
        *Association*

Robert K. Rasmussen, Esquire
Milton Underwood Professor of Law
Vanderbilt Law School
131  21st Avenue South

Nashville, TN   37240

*Counsel for (Amicus-appellants) Robert K. Rasmussen,*
*Barry Adler, Susan Block-Lieb, G. Marcus Cole,*
*Marcel Kahan, Ronald J. Mann, and David A. Skeel,*
*Jr.*

Adam H. Isenberg, Esquire
Saul Ewing LLP
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA   19102

Norman L. Pernick, Esquire
J. Kate Stickles, Esquire
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266, Suite 1200
Wilmington, DE   19899

Charles O. Monk, II, Esquire (Argued)
Joseph M. Fairbanks, Esquire
Henry R. Abrams, Esquire
Dan Friedman, Esquire
Saul Ewing LLP
100 South Charles Street, 16th Floor
Baltimore, MD   21201
    *Counsel for (Appellee) Owens Corning, a Delaware*
    *Corporation; CDC Corp.; Engineered Yarns American*
    *Inc.; Exterior Systems Inc.; Falcon Foam Corp.;*
    *Fibreboard Corp.; HomeExperts; Integrex; Integrex*
    *Professional Services; Integrex Testing Systems;*

4

*Integrex Supply Chain Solutions LLC; Integrex Ventures LLC; Jefferson Holdings Inc.; Owens-Corning Fiberglass Technology Inc.; Owens-Corning HT, Inc.; Owens-Corning Overseas Holdings, Inc.; Owens- Corning Remodeling Systems, LLC; Soltech, Inc.*

Elihu Inselbuch, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY   10022

Peter Van N. Lockwood, Esquire
Nathan D. Finch, Esquire
Walter B. Slocombe, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle NW
Washington, DC   20005

Marla R. Eskin, Esquire
Campbell & Levine, LLC
800 North King Street, Suite 300
Wilmington, DE   19801
    *Counsel for (Appellee) Official Committee of Unsecured Creditors*

Michael J. Crames, Esquire
Jane W. Parver, Esquire
Edmund M. Emrich, Esquire
Andrew A. Kress, Esquire
Kaye Scholer LLP

425 Park Avenue
New York, NY   10022

James L. Patton, Jr., Esquire
Joseph M. Barry, Esquire
Young, Conaway, Stargatt & Taylor LLP
1000 West Street, P.O. Box 391
17th Floor, Brandywine Building
Wilmington, DE   19801
>*Counsel for (Appellee) James J. McMonagle, Legal*
>*Representative for Future Claimants*

J. Andrew Rahl, Equire (Argued)
John B. Berringer, Esquire
John H. Doyle, III, Esquire
Howard Ressler, Esquire
Dennis J. Artese, Esquire
Anderson, Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY  10020

Francis A. Monaco, Jr.
Monzack & Monaco P.A.
1201 North Orange Street
400 Commerce Center
Wilmington, DE 19899
>*Counsel for (Appellee) Official Representatives of the*
>*Bondholders and Trade Creditors f/k/a Official*
>*Committee of Unsecured Creditors of Owens Corning*

6

Howard A. Rosenthal, Esquire
Alan R. Gordon, Esquire
Pelino & Lentz P.C.
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA 19103

Lawrence J. Kaiser, Esquire
Law Office of Laurence J. Kaiser
One Whitehall Street, Suite 2100
New York, NY 10004
    *Counsel for (Amicus-appellee) Commercial Law*
    *League America*

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities. Appellant Credit Suisse First Boston ("CSFB") is the agent for a syndicate of banks (collectively, the "Banks")[1] that

---

[1] Though CSFB is the named appellant, the real parties in interest are the Banks (which include CSFB). Thus, unless the context requires otherwise, CSFB and the Banks are referred to interchangeably in this opinion.

extended in 1997 a $2 billion unsecured loan to Owens Corning, a Delaware corporation ("OCD"), and certain of its subsidiaries. This credit was enhanced in part by guarantees made by other OCD subsidiaries. The District Court granted a motion to consolidate the assets and liabilities of the OCD borrowers[2] and guarantors in anticipation of a plan of reorganization.

The Banks appeal and argue that the Court erred by granting the motion, as it misunderstood the reasons for, and standards for considering, the extraordinary remedy of substantive consolidation, and in any event did not make factual determinations necessary even to consider its use. Though we reverse the ruling of the District Court, we do so aware that it acted on an issue with no opinion on point by our Court and differing rationales by other courts.

While this area of law is difficult and this case important, its outcome is easy with the facts before us. Among other problems, the consolidation sought is "deemed." Should we approve this non-consensual arrangement, the plan process would proceed as though assets and liabilities of separate entities were merged, but in fact they remain separate with the twist that the guarantees to the Banks are eliminated. From this we conclude that the proponents of substantive consolidation request it not to rectify the seldom-seen situations that call for

---

[2] For ease of reference, we refer hereinafter solely to OCD as the borrower.

this last-resort remedy but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors.

## I.  Factual Background and Procedural History

### A.  Owens Corning Group of Companies

OCD and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation.

Each subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented.[3]

---

[3] For example, Owens-Corning Fiberglass Technology, Inc. ("OCFT") was created as an intellectual property holding company to which OCD assigned all of its domestic intellectual property. OCFT licensed this intellectual property back to OCD in return for royalty payments. OCFT also entered into licensing agreements with parties outside of the OCD family of companies. This structure served to shield OCD's intellectual property assets (valued at over $500 million) from liability.

9

OCFT operated as an autonomous entity. It prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. OCFT had its own employees working at its Summit, Illinois plant, which contained machinery and equipment for research and development.

IPM, Inc. ("IPM") was incorporated as a passive Delaware investment holding company by OCD to consolidate the investments of its foreign subsidiaries. IPM shielded the foreign subsidiaries' investments from OCD liability and likewise shielded OCD from the liability of those foreign subsidiaries. OCD transferred ownership of its foreign subsidiaries to IPM and entered into a revolving loan agreement under which IPM loaned dividends from those subsidiaries to OCD. OCD paid interest on this revolving loan. IPM, like OCFT, entered into agreements with parties unaffiliated with the OCD group and operated as an autonomous entity. IPM also prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. IPM's officers oversaw all investment activity and maintained records of investment activity in IPM subsidiaries.

Both OCFT and IPM operated outside of OCD's business units. Neither company received administrative support from OCD and both paid payroll and business expenses from their own accounts. Although summaries of their accounting ledgers were entered into OCD's centralized cash management system, the underlying records were created and maintained by the subsidiaries, not OCD. OCFT and IPM even had their own company logos and trade names.

Integrex was formed by OCD as an asbestos liability

10

Although there may have been some "sloppy" bookkeeping, two of OCD's own officers testified that the financial statements of all the subsidiaries were accurate in all material respects. Further, through an examination of the subsidiaries' books, OCD's postpetition auditors (Ernst & Young) have eliminated most financial discrepancies, particularly with respect to the larger guarantor subsidiaries.

---

management company. For OCD's asbestos liability, Integrex ultimately processed only settled asbestos claims. The company also provided professional services (such as litigation management and materials testing) to the public. It had its own trade name and trademarked logo, its own business unit and its own financial team for business planning, and began several startup businesses that ultimately failed.

As discussed at Section I(B), infra, in 1997 OCD acquired Fibreboard Corporation. Subsequently, OCD formed Exterior Systems, Inc. ("ESI") as a separate entity after several subsidiaries of Fibreboard merged in 1999 in order to shield itself from successor liability for Fibreboard's asbestos products. Although the directors and managers of ESI and OCD overlapped, ESI observed corporate formalities in electing its directors and appointing its officers. In addition, it filed its own tax returns and kept its own accounting records. ESI held substantial assets, including over $1 billion in property, 20 factories, and between 150 and 180 distribution centers.

### B.    The 1997 Credit Agreement

In 1997 OCD sought a loan to acquire Fibreboard Corporation. At this time OCD faced growing asbestos liability and a poor credit rating that hindered its ability to obtain financing. When CSFB was invited to submit a bid, it included subsidiary guarantees in the terms of its proposal. The guarantees gave the Banks direct claims against the guarantors for payment defaults. They were a "credit enhancement" without which the Banks would not have made the loan to OCD. All draft loan term sheets included subsidiary guarantees.

A $2 billion loan from the Banks to OCD closed in June 1997. The loan terms were set out primarily in a Credit Agreement. Among those terms were the guarantee provisions and requirements for guarantors, who were defined as "present or future Domestic Subsidiar[ies] . . . having assets with an aggregate book value in excess of $30,000,000." Section 10.07 of the Agreement provided that the guarantees were "absolute and unconditional" and each "constitute[d] a guarant[ee] of payment and not a guarant[ee] of collection."[4] A "No Release of Guarantor" provision in § 10.8 stated that "the obligations of

---

[4] This standard guarantee term means simply that, once the primary obligor (here OCD) defaults, the Banks can proceed against the guarantors directly and immediately without first obtaining a judgment against OCD and collecting against that judgment to determine if a shortfall from OCD exists.

12

each guarantor . . . shall not be reduced, limited or terminated, nor shall such guarantor be discharged from any such obligations, for any reason whatsoever," except payment and performance in full or through waiver or amendment of the Credit Agreement. Under § 13.05 of the Credit Agreement, a guarantor could be released only through (i) the unanimous consent of the Banks for the guarantees of Fibreboard subsidiaries or through the consent of Banks holding 51% of the debt for other subsidiaries, or (ii) a fair value sale of the guarantor if its cumulative assets totaled less than 10% of the book value of the aggregate OCD group of entities.

CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with its subsidiaries. For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there

13

would be no effect on the guarantees' value.

## C.    Procedural History

On October 5, 2000, facing mounting asbestos litigation, OCD and seventeen of its subsidiaries (collectively, the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.[5]  Twenty-seven months later, the Debtors and certain unsecured creditor groups (collectively, the "Plan Proponents") proposed a reorganization plan (as amended, the "Plan") predicated on obtaining "substantive consolidation" of the Debtors along with three non-Debtor OCD subsidiaries.[6]  Typically this arrangement pools all assets and liabilities of the subsidiaries into their parent and treats all claims against the subsidiaries as transferred to the parent.  In fact, however, the Plan Proponents sought a form of

---

[5] For convenience we refer hereinafter simply to "Bankruptcy Code § ___" when citing to a Code section.

[6] As the Plan's consolidation provisions affected so significantly voting on the Plan and the manner of proceeding at any confirmation hearing, the Plan Proponents filed a motion for a ruling on consolidation in anticipation of those events.  "While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan."  In re Stone & Webster, Inc., 286 B.R. 532, 542 (Bankr. D. Del. 2002) (Walsh, J.).

what is known as a "deemed consolidation," under which a consolidation is deemed to exist[7] for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it.  Plan § 6.1. Yet "the Plan would not result in the merger of or the transfer or commingling of any assets of any of the Debtors or Non-Debtor Subsidiaries, . . . [which] will continue to be owned by the respective Debtors or Non-Debtors."  Plan § 6.1(a).  Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof . . . will be deemed to be one obligation of the Debtors with respect to the consolidated estate."  Plan § 6.1(b). Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarant[e]es of the 1997 Credit Agreement."  Plan Disclosure Statement at A-9897.

The Banks objected to the proposed consolidation.  Judge Alfred Wolin held a hearing on this objection.[8]  He was

_____

[7] "[A]ll assets and liabilities of each Subsidiary Debtor . . . *will be treated as though* they were merged into and with the assets and liabilities of OCD . . . ."  Plan § 6.1(b) (emphasis added).

[8] Pursuant to 28 U.S.C. § 157(d), Judge Wolin withdrew the reference of, inter alia, the consolidation motion to the Bankruptcy Court, thus making the District Court the judicial forum for the motion to proceed.

15

subsequently recused from the Debtors' bankruptcy proceedings in light of In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir. 2004), and Judge John Fullam was designated by the Chief Judge of our Court to replace him. Judge Fullam reviewed the transcripts and exhibits of the hearing, ordered additional briefing and on October 5, 2004, granted the consolidation motion in an order accompanied by a short opinion. In re Owens Corning, 316 B.R. 168 (Bankr. D. Del. 2004).

Judge Fullam concluded that there existed "substantial identity between . . . OCD and its wholly-owned subsidiaries." Id. at 171. He further determined that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors." Id. at 172. In Judge Fullam's view, it was "also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding. More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities." Id. at 171. As such, he held substantive consolidation should be permitted, as not only did it allow "obvious advantages . . . [, but was] a virtual necessity." Id. at 172. In any event, Judge Fullam wrote, "[t]he real issue is whether the Banks are entitled to participate, pari passu, with other unsecured creditors, or whether the Banks' claim is entitled to priority, in whole or in part, over the claims of other unsecured creditors." Id. But this issue, he stated, "cannot now be determined." Id.

16

CSFB appeals on the Banks' behalf.

## II. Appellate Jurisdiction

The Plan Proponents moved to dismiss the appeal of the District Court's order granting consolidation on the ground that it is not a "final decision" from which an appeal may be taken pursuant to 28 U.S.C. § 1291.[9] We denied that motion prior to oral argument in this case and noted that our reasoning would follow in this opinion.

Recognizing the "protracted nature of many bankruptcy proceedings, and the waste of time and resources that might result if immediate appeal [is] denied," United States Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999), "[w]e apply a broader concept of 'finality' when considering bankruptcy appeals under § 1291 than we do when considering other civil orders under the same section." In re Marvel Entm't Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998). See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) (noting that we impose a "relaxed standard" of finality because of unique considerations in bankruptcy cases); 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3926.2 at 274 (2d ed. 1996) (describing the

---

[9] This provision, rather than 28 U.S.C. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

17

"Third Circuit's especially flexible approach to bankruptcy finality"). Particularly relevant to our case is that "[t]o delay resolution of discrete claims until after final approval of a reorganization plan . . . would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." Clark v. First State Bank (In re White Beauty View, Inc.), 841 F.2d 524, 526 (3d Cir. 1988). We have also stressed that "issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly." Century Glove, Inc. v. First Am. Bank, 860 F.2d 94, 98 (3d Cir. 1988) (quoting Southeastern Sprinkler Co. Inc. v. Meyertech Corp. (In re Meyertech), 831 F.2d 410, 414 (3d Cir. 1987)).

We consider four factors in determining whether we should exercise jurisdiction over a bankruptcy appeal: "(1) [t]he impact on the assets of the bankrupt estate; (2) [the] [n]ecessity for further fact-finding on remand; (3) [t]he preclusive effect of [the Court's] decision on the merits of further litigation; and (4) [t]he interest of judicial economy." Buncher, 229 F.3d at 250. All four factors weigh heavily in favor of our jurisdiction to consider the appeal of an order granting substantive consolidation. We thus join the four Courts of Appeal that have exercised jurisdiction in this context. Alexander v. Compton (In re Bonham), 229 F.3d 750, 762 (9th Cir. 2000); First Nat'l Bank of El Dorado v. Giller (In re Giller), 962 F.2d 796, 797-98 (8th Cir. 1992); Eastgroup Props. v. S. Motel Ass'n., 935 F.2d 245,

18

248 (11th Cir. 1991); and <u>Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.</u> (<u>In re Augie/Restivo Baking Co., Ltd.</u>), 860 F.2d 515, 516-17 (2d Cir. 1988).

First, substantive consolidation has a profound effect on the assets of the consolidated entities. <u>See</u>, <u>e.g.</u>, <u>Nesbit v. Gears Unlimited</u>, 347 F.3d 72, 86-87 (3d Cir. 2003). Second, there is no need for additional fact-finding to assess the propriety of an order granting substantive consolidation. In this case, for example, Judge Fullam reached his decision after "[a] four-day evidentiary hearing . . . was held by [his] predecessor, Judge Wolin," and after Judge Fullam reviewed "the transcript of the testimony, and . . . the voluminous documentary record compiled in the course of the hearing, and [had] the benefit of post-trial briefing and argument." <u>In re Owens Corning</u>, 316 B.R. at 169. Third, a substantive consolidation order clearly has a preclusive effect on the merits of further litigation. In this case, the order precludes at least the Banks from asserting any right compromised or eliminated by virtue of the substantive consolidation. Last, the interests of judicial economy are best served by an immediate review of a substantive consolidation order. A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period).

Having concluded that we generally have jurisdiction to review appeals of substantive consolidation orders, we inquire

19

whether anything is "different" about this case. The Plan Proponents argue that

> [t]he District Court Order lacks finality because it will be implemented, if at all, only following approval of a disclosure statement, the solicitation and vote of creditors as to the terms of the Proposed Plan, and, assuming the requisite vote, final confirmation of the Proposed Plan, before which creditors other than the Bank Debt Holders shall be given the opportunity to contest substantive consolidation. [Bankruptcy Code] § 1129. Thus, the District Court Order is conditioned upon plan confirmation . . . . The District Court Order has no present impact on the Debtors' estates and does not change the status quo.

Plan Proponents' Mot. to Dismiss at 10. In support of this contention, the Plan Proponents rely primarily on In re A.S.K. Plastics, Inc., No. Civ. A. 04-2701, 2004 WL 1903322 (E.D. Pa. Aug. 24, 2004). Yet the conclusion that the Court lacked jurisdiction in A.S.K. Plastics was premised on the fact that

20

"[u]nder no reasonable construction of the law could the Order's *conditional* consolidation be viewed as effect[ing] a 'practical termination' of anything." Id. at *2 (emphasis in original). That order "emphasized [that] . . . [w]hen a final reorganization plan [was] submitted to the Bankruptcy Court, [the party appealing the order] [was] free to object to consolidation." Id. In effect, the A.S.K. Plastics order was designed to postpone consideration of the substantive consolidation issue until the plan confirmation stage.

That is not our case. For the Banks the District Court's determination is hardly conditional. It concluded "that substantive consolidation should be permitted." In re Owens Corning, 316 B.R. at 172. It made no provision for the Banks to reassert their objection to substantive consolidation at the plan confirmation stage; the order is final against them and is thus a practical termination of the substantive consolidation litigation.

Lastly, we address the Plan Proponents' argument that a substantive consolidation order must immediately take effect in order to be final for purposes of our jurisdiction. What they ignore is that the order approving substantive consolidation is the foundation on which the Plan is built. To assert that the actual substantive consolidation can only be implemented in conjunction with the effectiveness of an approved plan puts form over function. As the Banks point out, "[t]here is no support for the proposition that final orders lose their finality because of a delay in implementation." CSFB Opp'n to Mot. to

21

Dismiss at 13. Certainly, decisions resolving most disputes (notably, disputes over the validity and value of claims) are not implemented until a plan is confirmed and payment under the plan becomes obligatory. Yet we exercise jurisdiction to review many of these decisions before that "final" order issues. See, e.g., Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.), 405 F.3d 127 (3d Cir. 2005). No reason exists for us to vary that routine here.

We conclude readily that we have appellate jurisdiction to consider the Banks' appeal under 28 U.S.C. § 1291.

## III. Substantive Consolidation

Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

While we have not fully considered the character and scope of substantive consolidation, we discussed the concept in

22

Nesbit, 347 F.3d at 86-88 (surveying substantive consolidation case law for application by analogy to the Title VII inquiry of when to consolidate employers for the purpose of assessing a discrimination claim), and In re Genesis Health Ventures, 402 F.3d at 423-24 (examining, inter alia, whether a "deemed" consolidation for voting in connection with, and distribution under, a proposed plan of reorganization is a substantive consolidation for purposes of calculating U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6)).  Other courts, including the Supreme Court itself in an opinion that spawned the concept of consolidation, have holdings more on point than heretofore have we.  We begin with a survey of key cases, drawing from them when substantive consolidation may apply consistent with the principles we perceive as cabining its use, and apply those principles to this case.

## A.      History of Substantive Consolidation

The concept of substantively consolidating separate estates begins with a commonsense deduction.  Corporate disregard[10] as a fault may lead to corporate disregard as a remedy.

---

[10] A term used by Mary Elisabeth Kors in her comprehensive and well-organized article entitled Altered Egos: Deciphering Substantive Consolidation, 59 U. Pitt. L. Rev. 381, 383 (1998) (hereinafter "Kors").

Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its corporate parent as to be the parent's "alter ego," the "corporate veil" of the subsidiary can be ignored (or "pierced") under state law. Kors, supra, at 386-90 (citing as far back as I. Maurice Wormser, Piercing the Veil of Corporate Entity, 12 Colum. L. Rev. 496 (1912)). Or a court might mandate that the assets transferred to a corporate subsidiary be turned over to its parent's trustee in bankruptcy for wrongs such as fraudulent transfers, Kors, supra, at 391, in effect bringing back to the bankruptcy estate assets wrongfully conveyed to an affiliate. If a corporate parent is both a creditor of a subsidiary and so dominates the affairs of that entity as to prejudice unfairly its other creditors, a court may place payment priority to the parent below that of the other creditors, a remedy known as equitable subordination, which is now codified in § 510(c) of the Bankruptcy Code. See generally id. at 394-95.

Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation.[11] Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215 (1941). In Sampsell an individual in bankruptcy had transferred assets prepetition to a corporation he controlled.

---

[11] The actual term was not used until 1967. In re Commercial Envelope Mfg. Co., 3 Bankr. Ct. Dec. 647, 648 (Bankr. S.D.N.Y. 1977) (Babitt, J.).

24

(Apparently these became the corporation's sole assets.) When the bankruptcy referee ordered that the transferred assets be turned over by the corporation to the individual debtor's trustee, a creditor of the non-debtor corporation sought distribution priority with respect to that entity's assets. In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates." Id. at 219.

Each of these remedies has subtle differences. "Piercing the corporate veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. Turnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another (often an affiliate). Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." In re Genesis Health Ventures, 402 F.3d at 423. The bad news for certain creditors is that, instead of looking to assets of the

25

subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution.

Though the concept of consolidating estates had Supreme Court approval, Courts of Appeal (with one exception) were slow to follow suit. Stone v. Eacho (In re Tip Top Tailors, Inc.), 127 F.2d 284 (4th Cir. 1942), cert. denied, 317 U.S. 635 (1942), was the first to pick up on Sampsell's new remedy.[12] Little occurred thereafter for more than two decades, until the Second Circuit issued several decisions—Soviero v. National Bank of Long Island, 328 F.2d 446 (2d Cir. 1964); Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.), 369 F.2d 845 (2d Cir. 1966); Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.), 432 F.2d 1060 (2d Cir. 1970); and Talcott v. Wharton (In re Continental Vending Machine

---

[12] Another case oft-mentioned, and preceding both Sampsell and Stone, is Fish v. East, 114 F.2d 177 (10th Cir. 1940). Determining that a corporate subsidiary was simply the parent's "instrumentality," id. at 191, the Tenth Circuit affirmed the turnover of the subsidiary's assets to the parent. Though asserting that a "corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud," id., "consolidation" was not mentioned. Indeed, as creditors of the subsidiary in Fish were given first priority as to its assets, id., a complete consolidation did not occur. Accord Kors, supra, at 391 ("true consolidation" occurs only when creditors of consolidated entities share pari passu).

26

Corp.), 517 F.2d 997 (2d Cir. 1975)—that brought substantive consolidation as a remedy back into play and premise its modern-day understanding.

Other Circuit Courts fell in line in acknowledging substantive consolidation as a possible remedy. See, e.g., FDIC v. Hogan (In re Gulfco Inv. Corp.), 593 F.2d 921, 927-28 (10th Cir. 1979); Pension Benefit Guar. Corp. v. Ouimet, 711 F.2d 1085, 1092-93 (1st Cir. 1983); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987); Eastgroup, 935 F.2d at 252; In re Giller, 962 F.2d at 799; First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 974 F.2d 712, 720 (6th Cir. 1992); Reider v. FDIC (In re Reider), 31 F.3d 1102, 1106-07 (11th Cir. 1994); and In re Bonham, 229 F.3d at 771.

The reasons of these courts for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, Stone and Soviero followed the well-trod path of alter ego analysis in state "pierce-the-corporate-veil" cases. Stone, 127 F.2d at 287-89; Soviero, 328 F.2d at 447-48. Accord In re Giller, 962 F.2d at 798; In re Gulfco Inv., 593 F.2d at 928-29. Kheel dealt with, inter alia, the net-negative practical effects of attempting to thread back the tangled affairs of entities, separate in name only, with "interrelationships . . . hopelessly obscured." 369 F.2d at 847. See also, e.g., In re Augie/Restivo, 860 F.2d at 518-19. In re Continental Vending Machine balanced the "inequities" involved when substantive

27

rights are affected against the "practical considerations" spawned by "accounting difficulties (and expense) which may occur where the interrelationships of the corporate group are highly complex, or perhaps untraceable." 517 F.2d at 1001. See also, e.g., In re Auto-Train, 810 F.2d at 276; Eastgroup, 935 F.2d at 249; In re Giller, 962 F.2d at 799; In re Reider, 31 F.3d at 1108. See generally Kors, supra, at 402-06.

Ultimately most courts slipstreamed behind two rationales—those of the Second Circuit in Augie/Restivo and the D.C. Circuit in Auto-Train. The former found that the competing "considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors . . . ." In re Augie/Restivo, 860 F.2d at 518 (internal quotation marks and citations omitted). Auto-Train touched many of the same analytical bases as the prior Second Circuit cases, but in the end chose as its overarching test the "substantial identity" of the entities and made allowance for consolidation in spite of creditor reliance on separateness when "the demonstrated benefits of consolidation 'heavily' outweigh the harm." In re Auto-Train, 810 F.2d at 276 (citation omitted).

Whatever the rationale, courts have permitted substantive

28

consolidation as an equitable remedy in certain circumstances.[13] No court has held that substantive consolidation is not authorized,[14] though there appears nearly

---

[13] Indeed, they have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors, see, e.g., In re Bonham, 229 F.3d at 765 (explaining that "[c]ourts have permitted the consolidation of non-debtor and debtor entities in furtherance of the equitable goals of substantive consolidation") (citing In re Auto-Train, 810 F.2d at 275-77; In re Tureaud, 59 B.R. 973, 974, 978 (N.D. Okla. 1986); In re Munford, 115 B.R. 390, 395-96 (Bankr. N.D. Ga. 1990)); Soviero, 328 F.2d 446, and in some cases consolidation retroactively (known also as nunc pro tunc consolidation), see, e.g., In re Baker & Getty Financial Services, 974 F.2d at 720-21; Kroh Brothers Development Co. v. Kroh Brothers Management Co. (In re Kroh Brothers Development Co.), 117 B.R. 499, 502 (W.D. Mo. 1989); In re Tureaud, 59 B.R. at 977-78; see also Auto-Train, 810 F.2d at 277 (acknowledging that nunc pro tunc consolidations can occur, though not in that case).

In addition, though we do not permit the consolidation sought in this case, no reason exists to limit it under the right circumstances to any particular form of entity. (Indeed, this case involves corporations and limited liability companies.) Accord 2 Collier on Bankruptcy ¶ 105.09[1][c] (15th rev. ed. 2005).

[14] See In re Bonham, 229 F.3d at 765 (explaining that "the equitable power [of substantive consolidation] undoubtedly survived enactment of the Bankruptcy Code" and noting that "[n]o case has held to the contrary"); but see In re Fas Mart

29

Convenience Stores, Inc., 320 B.R. 587, 594 n.3 (Bankr. E.D. Va. 2004) (noting "there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation") (citing Daniel B. Bogart, Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall, 35 Ariz. St. L.J. 793, 810 (2003); J. Maxwell Tucker, Grupo Mexicano and the Death of Substantive Consolidation, 8 Am. Bankr. Inst. L. Rev. 427 (2000) (hereinafter "Tucker")).

Since the Supreme Court's decision in Grupo Mexicano Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999) (federal district courts lack the equitable power to enjoin prejudgment transfers of assets, as such an equitable remedy did not exist at the time federal courts were created under the Judiciary Act of 1789), some argue that substantive consolidation, judge-made law not expressly codified in the Bankruptcy Code adopted in the late 1970s, does not qualify as an available equitable remedy. See, e.g., Tucker, supra at 442-45. This argument has two facets. The first is that bankruptcy courts are limited to exercising only the equitable remedies extant at the time of the adoption of the Judiciary Act of 1789. As substantive consolidation is a relatively recent remedy nowhere contemplated in 1789, Grupo Mexicano by analogy bars substantive consolidation just as it does prejudgment preliminary injunctions forbidding asset transfers. Id. The second (and corollary) facet of the argument is that, as substantive consolidation is not specifically authorized in the Bankruptcy Code, authority to confer it can exist, if at all, only

30

in § 105(a) of the Bankruptcy Code (bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title"). Even if § 105(a) "constitutes a direct, fresh grant of supplemental power to the bankruptcy courts, independent of the power granted to the federal courts under title 28 [of the United States Code]," id. at 447, it can only implement powers already expressed in the provisions of the Bankruptcy Code. Id. at 447-48. See In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) ("The general grant of equitable power contained in § 105(a). . . must be exercised within the parameters of the Code itself."); In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004) ("The power conferred by § 105 is one to implement rather than to override."). But for joint spouse estates in Bankruptcy Code § 302(a), consolidation is permitted only in the context of a confirmed plan of reorganization and the requirements that entails. Tucker, supra, at 449 (citing to, inter alia, Bankruptcy Code § 1123(a)(5)(C)).

The first facet of the argument is, at the outset, premature. Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's Sampsell decision in 1941. 313 U.S. at 219. What the Court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option. See In re Stone & Webster, 286 B.R. at 540 (quoting Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), Adv. No. 01-3065 (RG) (Bankr. D.N.J. March 12, 2001) (Hearing Tr. at 71-2)).

In addition, at the core of Grupo Mexicano was the extent

31

of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in Grupo Mexicano, he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. First, he pointed out that "*[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [the] conduct [at issue]*; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." Grupo Mexicano, 527 U.S. at 322 (emphasis added). Second, he stressed that finding the authority to justify the District Court's remedy in generalized equity power would "add[], through judicial fiat, a new and powerful weapon to the creditor's arsenal[;] the new rule could radically alter the balance between debtor's and creditor's rights *which has been developed over centuries through many laws– including those relating to bankruptcy, fraudulent conveyances, and preferences*." Id. at 331 (emphasis added).

In short, the Court's opinion in Grupo Mexicano acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in Grupo Mexicano been in bankruptcy, the bankruptcy court

unanimous consensus that it is a remedy to be used "sparingly." In re Augie/Restivo, 860 F.2d at 518; see also In re Bonham, 229 F.3d at 767 (explaining that "almost every other court has noted [that substantive consolidation] should be used

---

would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.

As for the argument's second facet, it begins with a concession. Bankruptcy Code § 1123(a)(5)(C)'s very words allow for "consolidation of the debtor with one or more persons" pursuant to a plan "[n]otwithstanding any otherwise applicable non-bankruptcy law." Accord Tucker, supra, at 448-49. See also In re Stone & Webster, 286 B.R. at 540-43. Whether § 105(a) allows consolidation outside a plan is an issue we need not address—though that arguably is what the Plan Proponents propose by moving for a "deemed" consolidation—because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.

In this context, we also need not address the argument, made in the Amicus Curiae Brief of the Commercial Finance Association, that substantive consolidation fails the "best interests test" of Bankruptcy Code § 1129(a)(7) (a requirement for plan confirmation that each creditor that does not vote to accept the plan must receive or retain property under the plan at least equal to its recovery in a Bankruptcy Code Chapter 7 liquidation). See generally In re Stone & Webster, 286 B.R. at 544-46.

33

'sparingly'") (citing <u>In re Flora Mir</u>, 432 F.2d at 1062-63).[15]

**B.      Our View of Substantive Consolidation**

Substantive consolidation exists as an equitable remedy. But when should it be available and by what test should its use be measured?   As already noted, we have commented on substantive consolidation only generally in <u>Nesbit</u>, 347 F.3d at 86-88, and <u>In re Genesis Health Ventures</u>, 402 F.3d at 423-24. The latter nonetheless left little doubt that, if presented with a choice of analytical avenues, we favor essentially that of <u>Augie/Restivo</u>. <u>Id.</u> at 423.  The <u>Auto-Train</u> approach (requiring "substantial identity" of entities to be consolidated, plus that consolidation is "necessary to avoid some harm or realize some benefit," 810 F.2d at 276) adopts, we presume, one of the <u>Augie/Restivo</u> touchstones for substantive consolidation while adding the low bar of avoiding some harm or discerning some benefit by consolidation.  To us this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not

---

[15] Thus we disagree with the assertion of a "liberal trend" toward increased use of substantive consolidation—<u>e.g.</u>, <u>Eastgroup</u>, 935 F.2d at 248 (describing "a 'modern' or 'liberal' trend toward allowing substantive consolidation") (citing <u>In re Murray Indus., Inc.</u>, 119 B.R. 820, 828 (Bankr. M.D. Fla. 1990)); <u>In re Vecco Construction Industries, Inc.</u>, 4 B.R. 407, 409 (Bankr. E.D. Va. 1980).

sufficiently egregious and too imprecise for easy measure. For example, we disagree that "[i]f a creditor makes [a showing of reliance on separateness], the court may order consolidation . . . if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." Id. at 276 (citation omitted); see also Eastgroup, 935 F.2d at 249. If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-à-vis the claims of that creditor.[16]

In assessing whether to order substantive consolidation, courts consider many factors (some of which are noted in Nesbit, 347 F.3d at 86-88 nn. 7 & 9). They vary (with degrees of overlap) from court to court. Rather than endorsing any prefixed factors, in Nesbit we "adopt[ed] an intentionally open-ended, equitable inquiry. . . to determine when substantively to

---

[16] This opens the question whether a court can order partial consolidation (such a consolidation order "could provide that . . . [a creditor relying on separateness] would receive a distribution equal to what [it] would have received absent consolidation and that the remainder of the assets and liabilities be consolidated.") Kors, supra, at 450-51. Because this theoretical issue is not before us—and in any event (i) facts bringing it to the fore are unlikely, id. at 451 ("If circumstances lead one party to rely on the single status of the one debtor, it is unlikely that other creditors are relying on the joint status of the two entities, especially as reliance must be reasonable."), and (ii) may present practical concerns depending on the facts of a particular case—we do not decide it in this case.

35

consolidate two entities." Id. at 87. While we mentioned that "in the bankruptcy context the inquiry focuses primarily on financial entanglement," id., this comment primarily related to the hopeless commingling test of substantive consolidation. But when creditors deal with entities as an indivisible, single party, "the line between operational and financial [factors] may be blurred." Id. at 88. We reiterate that belief here. Too often the factors in a check list fail to separate the unimportant from the important, or even to set out a standard to make the attempt. Accord Br. of Law Professors[17] as Amici Curiae at 11-12. This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play). Id. ("[D]iffering tests with . . . agreed . . . factors run the risk that courts will miss the forest for the trees. Running down factors as a check list can lead a court to lose sight of why we have substantive consolidation in the first instance . . . and often [to] fail [to] identify a metric by which [it] can . . . [assess] the relative importance among the factors. The . . . [result is] resort to ad hoc balancing without a steady eye on the . . . [principles]

---

[17]They are Robert K. Rasmussen of Vanderbilt Law School, Barry Adler of the NYU School of Law, Susan Block-Leib of Fordham University School of Law, G. Marcus Cole of Stanford Law School, Marcel Kahan of the NYU School of Law, Ronald J. Mann of the University of Texas Law School, and David A. Skeel, Jr. of the University of Pennsylvania School of Law.

to be advanced . . . .").

What, then, are those principles? We perceive them to be as follows.

(1)     Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[]." Kors, supra, at 410. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2)     The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness.[18] Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (e.g., fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3)     Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding

---

[18] Though creditors conceivably can cause debtors to conflate separate organizational forms, the specter of lender liability (which came to the fore in only the last two decades) makes this theoretical possibility all the more remote.

37

other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4)    Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5)    While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

The upshot is this. In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity,[19] or (ii) postpetition their assets and liabilities are so

---

[19] This rationale is meant to protect in bankruptcy the prepetition expectations of those creditors. Accord Kors, supra,

38

scrambled that separating them is prohibitive and hurts all creditors.[20]

Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A prima facie case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of

---

at 419. The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one.

[20] This rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled." In re Gulfco Inv., 593 F.2d at 929; In re Vecco, 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise Jarndyce v. Jarndyce, the fictional suit in Dickens' Bleak House where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy–enhancing the value of the assets available to creditors . . .–often in a very material respect." Kors, supra, at 417 (citation omitted).

39

creditors[21] that they were dealing with debtors as one indistinguishable entity. Kors, supra, at 417-18; Christopher W. Frost, Organizational Form, Misappropriation Risk and the Substantive Consolidation of Corporate Groups, 44 Hastings L.J. 449, 457 (1993). Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Kors, supra, at 418-19. Creditor opponents of consolidation can nonetheless defeat a prima facie showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence.[22]

### C. Application of Substantive Consolidation to Our Case

With the principles we perceive underlie use of substantive consolidation, the outcome of this appeal is apparent at the outset. Substantive consolidation fails to fit the facts of

---

[21] "[T]ort and statutory claimants, who, as involuntary creditors, by definition did not rely on anything in becoming creditors," Kors, supra, at 418, are excluded, leaving only those creditors who contract with an entity for whom consolidation is sought.

[22] As noted already, supra n.16, we do not decide here whether such a showing by an opposing creditor defeats totally the quest for consolidation or merely consolidation as to that creditor.

our case and, in any event, a "deemed" consolidation cuts against the grain of all the principles.

To begin, the Banks did the "deal world" equivalent of "Lending 101." They loaned $2 billion to OCD and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was "structural seniority"—a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task.

### 1. NO PREPETITION DISREGARD OF CORPORATE SEPARATENESS

Despite the Plan Proponents' pleas to the contrary, there is no evidence of the prepetition disregard of the OCD entities' separateness. To the contrary, OCD (no less than CSFB) negotiated the 1997 lending transaction premised on the separateness of all OCD affiliates. Even today no allegation exists of bad faith by anyone concerning the loan.[23] In this context, OCD and the other Plan Proponents cannot now ignore,

---

[23] The bondholders do claim certain Banks misled them in purchasing OCD debt subsequent to the 1997 loan. But we know of no claim of wrong by the Banks in connection with the 1997 transaction.

41

or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes. As such, the District Court's conclusions of "substantial identity" of OCD and its subsidiaries, and the Banks' reliance thereon, are incorrect. For example, testimony presented by both the Banks and the Debtors makes plain the parties' intention to treat the entities separately. CSFB presented testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the value of the guarantees as partially derived from the separateness of the entities. As OCD concedes, these representatives "testified that the guarant[e]es were . . . intended to provide 'structural seniority' to the banks," and were thus fundamentally premised on an assumption of separateness. Debtors Ans. Br. at 26.

In the face of this testimony, Plan Proponents nonetheless argue that the Banks intended to ignore the separateness of the entities. In support of this contention, they assert, inter alia, that because the Banks did not receive independent financial statements for each of the entities during the negotiating process, they must have intended to deal with them as a unified whole. Because the Banks were unaware of the separate financial makeup of the subsidiaries, the argument goes, they

could not have relied on their separateness.[24]

This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from OCD, including information about

---

[24] Debtors make a similar argument on the basis of the Banks' failure to exercise their right to monitor the entities independently. For much the same reasoning that follows in the text, we reject that argument as well.

We reject outright Debtors' claim that the Banks' alleged reliance on corporate separateness fails because they did not obtain a third-party legal opinion from counsel that substantive consolidation was unlikely to occur were OCD or the guarantors subject to bankruptcy. By custom and practice this type of counsel opinion is requested and given for newly formed entities whose "special purpose" is to obtain structured financing (i.e., where "a defined group of assets . . . [are] structurally isolated, and thus serve as the basis of a financing . . . ." Committee on Bankruptcy and Corporate Reorganization of The Association of the Bar of the City of New York, Structured Financing Techniques, 50 Bus. Law. 527, 529 (1995)). It is customarily not given (nor even requested) for entities in existence for any significant period of time or set up for other than a structured financing transaction. See Tribar Opinion Committee, Opinions in the Bankruptcy Context: Rating Agency, Structured Financing, and Chapter 11 Transactions, 46 Bus. Law, 717, 726 & n.42 (1991).

that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries. For example, they knew that each subsidiary guarantor had assets with a book value of at least $30 million as per the terms of the Credit Agreement, that the aggregate value of the guarantor subsidiaries was over $900 million and that those subsidiaries had little or no debt. Additionally, the Banks knew that Fibreboard's subsidiaries (including the entities that became part of ESI) had no asbestos liability, would be debt-free post-acquisition and had assets of approximately $700 million.

Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor. Creditors are free to employ whatever metrics they believe appropriate in deciding whether to extend credit free of court oversight. We agree with the Banks that "the reliance inquiry is not an inquiry into lenders' internal credit metrics. Rather, it is about the *fact* that the credit decision was made in reliance on the existence of separate entities . . . ." CSFB Opening Br. at 31 (emphasis in original).[25] Here there is no serious dispute as to that fact.

_____

[25] Further, a creditor's lack of diligence is relevant only insofar as it bears on the credibility of its assertion of reliance on separateness.

44

## 2. NO HOPELESS COMMINGLING EXISTS POSTPETITION

There also is no meaningful evidence postpetition of hopeless commingling of Debtors' assets and liabilities. Indeed, there is no question which entity owns which principal assets and has which material liabilities. Likely for this reason little time is spent by the parties on this alternative test for substantive consolidation. It is similarly likely that the District Court followed suit.

The Court nonetheless erred in concluding that the commingling of assets will justify consolidation when "the affairs of the two companies are so entangled that consolidation *will be beneficial*." In re Owens Corning, 316 B.R. at 171 (emphasis added). As we have explained, commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short. The District Court's test not only fails to adhere to the theoretical justification for "hopeless commingling" consolidation—that no creditor's rights will be impaired—but also suffers from the infirmity that it will almost always be met. That is, substantive consolidation will nearly

45

always produce some benefit to some in the form of simplification and/or avoidance of costs. Among other things, following such a path misapprehends the degree of harm required to order substantive consolidation.

But no matter the legal test, a case for hopeless commingling cannot be made. Arguing nonetheless to the contrary, Debtors assert that "it would be practically impossible and prohibitively expensive in time and resources" to account for the voluntary bankruptcies of the separate entities OCD has created and maintained. Debtors Ans. Br. at 63. In support of this contention, Debtors rely almost exclusively on the District Court's findings that

> it would be exceedingly difficult to untangle the financial affairs of the various entities . . . [and] there are . . . many reasons for challenging the accuracy of the results achieved [in accounting efforts thus far]. For example, transfers of cash between subsidiaries and parent did not include any payment of interest; and calculations of royalties are subject to question.

In re Owens Corning, 316 B.R. at 171. Assuming arguendo that these findings are correct, they are simply not enough to

46

establish that substantive consolidation is warranted.

Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation. We find R 2 Investments, LDC v. World Access, Inc. (In re World Access, Inc.), 301 B.R. 217 (Bankr. N.D. Ill. 2003), instructive on this point. In World Access the Court noted that the controlling entity "had no uniform guidelines for the recording of intercompany interest charges" and that the debtors failed to "allocate overhead charges amongst themselves." Id. at 234. The Court held, however, that those accounting shortcomings were "merely imperfections in a sophisticated system of accounting records that were conscientiously maintained." Id. at 279. It ultimately concluded that "all the relevant accounting data . . . still exist[ed]," that only a "reasonable review to make any necessary adjustments [was] required," and, thus, that substantive consolidation was not warranted. Id.

The record in our case compels the same conclusion. At its core, Debtors' argument amounts to the contention that because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities is a hopeless endeavor. Yet imperfection in intercompany accounting is assuredly not atypical in large, complex company structures. See, e.g., Lynn M. LoPucki, The Myth of the Residual Owner, 16 n.50 (2004), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=401160.

47

For obvious reasons, we are loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy. And we find no reason to doubt that "perfection is not the standard in the substantive consolidation context." In re World Access, 301 B.R. at 279. We are confident that a court could properly order and oversee an accounting process that would sufficiently account for the interest and royalty payments owed among the OCD group of companies for purposes of evaluating intercompany claims—dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions.

On the basis of the record before us, the Plan Proponents cannot fulfill their burden of demonstrating that Debtors' affairs are even tangled, let alone that the cost of untangling them is so high relative to their assets that the Banks, among other creditors, will benefit from a consolidation.[26]

### 3.  OTHER CONSIDERATIONS DOOM CONSOLIDATION AS WELL

Other considerations drawn from the principles we set out also counsel strongly against consolidation. First of all,

---

[26] For example, we simply cannot imagine that it would cost Debtors even 1% of the Banks' asserted $1.6 billion claim to account for the allegedly incalculable intercompany interest and royalty payments.

holding out the possibility of later giving priority to the Banks on their claims does not cure an improvident grant of substantive consolidation. Among other things, the prerequisites for this last-resort remedy must still be met no matter the priority of the Banks' claims.

Secondly, substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena.[27]

But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (i.e., a

---

[27] The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as means to gerrymander consolidation of estates.

pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

**IV. Conclusion**

Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities. Accord Kheel, 369 F.2d at 848 (Friendly, J., concurring) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite . . . ."). No principled, or even plausible, reason exists to undo OCD's and the Banks' arms-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit—a $2 billion loan

50

unsecured by OCD and guaranteed by others only in part. To overturn this bargain, set in place by OCD's own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip (if not area) codes away from anything resembling substantive consolidation," In re Genesis Health Ventures, 402 F.3d at 424—fails even to qualify for consideration. It is here a tactic used as a sword and not a shield.

We thus reverse and remand this case to the District Court.

51