# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-1079
_____

In re: The Archdiocese of Saint Paul and Minneapolis

*Debtor*

------------------------------

The Official Committee of Unsecured Creditors

*Appellant*

v.

The Archdiocese of Saint Paul and Minneapolis; The Catholic Community Foundation of Minnesota; Benilde-St. Margaret's School; DeLaSalle High School; Grace High School, doing business as Totino-Grace High School; The Parish Group; The Church of St. Patrick of Edina, Minnesota; The Official Committee of Parish Creditors; St. Dominic Catholic Church; St. Stephen's Catholic Church and School; Church of St. Thomas the Apostle; St. Ambrose of Woodbury; St. Bartholomew Catholic Faith Community; Church of St. Pius X; Christ The King Church; The Church of the Incarnation of Minneapolis; St. Vincent de Paul Catholic Church; The Church of the Epiphany; Immaculate Heart of Mary; St. Michael Catholic Church; Saint Peter Claver Church; The Church of Our Lady of Grace; The Catholic Cemeteries; The Church of St. Charles Borromeo of Minneapolis, MN; Catholic Finance Corporation; The Church of Saint Anne - Saint Joseph Hien; Faithful Shepherd Catholic School; The Guardian Angels Catholic Church of Oakdale, Minnesota; The Church of St. Joseph of Rosemount, Minnesota; The Church of St. Thomas Becket

*Appellee*s

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: December 12, 2017
Filed: April 26, 2018

_____

Before WOLLMAN, LOKEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

The Official Committee of Unsecured Creditors (the "Committee") appeals the district court's[1] affirmance of the bankruptcy court's[2] decision to deny the Committee's motion for substantive consolidation of the Archdiocese of Saint Paul and Minneapolis (the "Archdiocese" or "Debtor") and over 200 affiliated non-profit non-debtors (collectively, the "Targeted Entities"). In extraordinary circumstances, the broad equitable powers under 11 U.S.C. § 105(a) grant the bankruptcy court the authority to substantively consolidate certain entities. The court's powers under § 105(a), however, are limited by explicit statutory provisions, such as 11 U.S.C. § 303(a). Section 303(a) protects bona fide non-profit organizations from involuntary bankruptcy. The Committee failed to plausibly allege sufficient facts to negate the non-profit non-debtor status of the Targeted Entities. The Targeted Entities, therefore, are entitled to the protections under § 303(a) and cannot be involuntarily substantively consolidated with Debtor. We affirm.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]The Honorable Robert J. Kressel, United States Bankruptcy Judge for the District of Minnesota.

# I. Factual and Procedural History

The Archdiocese is a geographically defined entity of the Roman Catholic Church (the "Church") covering the Saint Paul and Minneapolis metropolitan area. Originally established in the mid-to-late 1800s, today there are over 180 parishes in the Archdiocese as well as several schools and related organizations. The ecclesiastical and civil leader of the Archdiocese is the Archbishop, appointed by the Pope. Each parish has a pastor, who is appointed and subject to removal by the Archbishop.

In May 2013, the state of Minnesota enacted the Minnesota Child Victim's Act, allowing certain individuals with previously time-barred claims to bring civil lawsuits for a period of three years. As a result, hundreds of claims of clergy sexual abuse were filed against the Archdiocese.

In January 2015, the Archdiocese voluntarily filed a petition for Chapter 11 bankruptcy. In May 2016, the Committee, representing more than 400 clergy sexual abuse claimants, filed a motion in bankruptcy court to substantively consolidate Debtor with over 200 affiliated non-profit entities. These Targeted Entities include 187 parish corporations, several primary and secondary schools, the Catholic Community Foundation of Minnesota, the Francophone African and Gichitwaa Kateri Chaplaincies, Segrado Corizon de Jesus, the Newman Center and Chapel, The Catholic Cemeteries, and the Catholic Finance Corporation.

The bankruptcy court applied Rule 7012 of the Federal Rules of Bankruptcy Procedure to the Committee's motion, converting the motion to an adversary proceeding and allowing the responding parties to utilize Federal Rule of Civil Procedure 12. In response, Debtor and several of the Targeted Entities filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and motions for judgment on the pleadings under Rule 12(c). The bankruptcy court heard arguments on the motion for substantive consolidation as well as the Rule 12 motions.

The bankruptcy court granted the motions for dismissal and denied the motion for substantive consolidation, and the district court affirmed the bankruptcy court's order. The Committee filed a timely appeal.

## II. The Complaint

In their motion for substantive consolidation (the "Complaint"), the Committee alleges the majority of the Archdiocese's assets are held by the Targeted Entities.[3] The Complaint argues the Archdiocese has "direct control and supervision in all material aspects" of the Targeted Entities, and, therefore, the assets of the Targeted Entities should be treated as the assets of the Archdiocese. In support of this position, the Complaint cites the role the Archdiocese plays in terms of (1) the incorporation of the Targeted Entities under state law; (2) the oversight of financial and property-related decision-making; (3) the management of priest employment and diocese-wide employment policies; (4) the management of excess parish funds (the Inter-Parish Loan Fund) and parish insurance premiums (the General Insurance Fund); and (5) the operational changes to affiliated non-parish entities.

Chapter 315 of the Minnesota Statutes, titled "Religious Societies," governs the operations of religious organizations. See generally Minn. Stat. Ann. §§ 315.01–.51. Chapter 315 addresses the formation and general powers of religious corporations, including parishes and dioceses. The Chapter also addresses tax-exempt property, insurance laws and certain employee benefits, as well as the consolidation, merger, and dissolution of parishes.

Sections 315.15 and 315.16 govern parish and diocesan corporations. Section 315.15 requires the involvement of the bishop, the vicar general of a diocese, and the priest of the parish when forming a parish corporation. Together, the bishop, vicar

---

[3]We deny the Committee's motion to supplement the record on appeal and take note of the bankruptcy court's order denying the reorganization plans submitted by Debtor and by the Committee.

general, and parish priest select two laymembers to serve on the parish corporation's board. These five board members form a religious corporation by adopting, signing, and filing articles of incorporation and recording a copy with the county where the parish corporation is located. Laymembers serve on the parish board for two-year terms, at which point the bishop, vicar general, and priest "designate[] and appoint[]" two new laymembers to serve for a subsequent two-year term. Minn. Stat. Ann. § 315.15. According to the Complaint, parish corporations typically adopt and file uniform articles of incorporation and bylaws as provided by the Archdiocese.

In addition to the corporate formalities established by the state, the Archdiocese follows canon law, which are internal regulations established by Church leadership. The Complaint alleges the Archbishop of the Archdiocese holds "all of the power" in the diocese, subject only to canon law and the Pope.

The Complaint alleges the Archdiocese requires prior approval before parishes initiate certain financial and property-related actions. For example, parishes need to obtain written permission, in the form of a proxy vote, from the Archbishop and the vicar general before parishes:

> [p]urchase any interest in real property; [t]ransfer or rezone any interest in real property; [e]nter into any loan; [g]rant any mortgage; [e]stablish any line of credit; [c]onsolidate or refinance any existing loan; [m]odify any existing mortgage, loan, or line of credit; [p]urchase personal property of $25,000 or more; [e]nter a lease of any kind for a term of longer than one year; . . . [g]rant contracts for deed; [b]uild any new structure on parish property; [r]enovate or restore any existing parish improvements; . . . [a]pprove construction change orders that increase costs by $5,000 or more; . . . [i]nitiate a capital fund campaign in which the total projected annual expenses exceed $25,000; [e]stablish any endowment.

In practice, the proxy requests are reviewed by the Archdiocese's Chief Financial Officer and Chancellor for Civil Affairs.

Additionally, the Complaint alleges the Archdiocese retains the ability to make decisions as to the closure and merger of parishes. The Complaint identifies twenty-one occasions between 2010 and 2016 where the Archdiocese merged or closed parishes despite opposition from the parish priest, lay trustees, and parishioners. Four of the twenty-one parishes unsuccessfully appealed the Archdiocese's decision to the Vatican. In at least one instance, parishioners were not consulted prior to the announcement of a parish merger. As one Parish Administrator noted:

> In my time as priest and a Parish Administrator, I never felt or believed that the parishes had control over their own assets and operations. The Bishop and Archbishop always maintained direct and ultimate control. It was as if the parishes were merely departments in the Diocese or Archdiocese organization . . . .

According to the Complaint, the Archdiocese and the parishes share financial and managerial responsibility for parish priests and employees. Typically, the parish directly compensates its priest, while the Archdiocese is responsible for ordaining, assigning, reassigning, and terminating priests within the diocese. The Archdiocese sets a priest's salary, health benefits, and vacation time. The Archdiocese also plays a role in the employment process for parishes and parish schools, including defining employee benefits, setting employee policies, requiring background checks, and providing some job training.

The Complaint notes the Archdiocese operates the Inter-Parish Loan Fund and the General Insurance Fund, which are allegedly funded by individual parish contributions and managed by the Archdiocese. The Complaint also highlights several events involving non-parish organizations included in the motion for substantive consolidation, arguing these events show a blurring of corporate lines. For example, the Complaint alleges in October 2013 the articles of incorporation for the Catholic Community Foundation were amended to remove the Archdiocese as a receiver in the event of its dissolution. In December 2013, the Catholic Services Appeal Foundation was incorporated and allegedly assumed work previously

performed in-house by the Archdiocese, including the management of the annual Catholic Services Appeal. At the time of its incorporation, the Catholic Services Appeal Foundation's offices were reportedly within the Archdiocese's office space. After the Archdiocese filed for bankruptcy, the Catholic Services Appeal Foundation allegedly moved offices.

Additionally, in 2014, the Catholic Charities removed the Archdiocese as the beneficiary in the event of a dissolution. A few months after the Archdiocese filed for bankruptcy, The Catholic Cemeteries removed the Archdiocese from its public title and removed references to its board, including the fact that the Archbishop is the president, from its website.

### III. Standard of Review

As the second reviewing court, we independently apply the same standard of review as the district court, reviewing conclusions of law *de novo*. In re Usery, 123 F.3d 1089, 1093 (8th Cir. 1997). Interpretation of the Bankruptcy Code is a question of law requiring *de novo* review. In re Graven, 936 F.2d 378, 384–85 (8th Cir. 1991).

We also review *de novo* a bankruptcy court's grant of motions to dismiss and motions for judgment on the pleadings. JPMorgan Chase Bank, N.A. v. Johnson, 719 F.3d 1010, 1014–15 (8th Cir. 2013) (citing Detroit Gen. Ret. Sys. v. Medtronic, Inc., 621 F.3d 800, 804 (8th Cir. 2010) (motion to dismiss); Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002) (motion for judgment on the pleadings)). Accordingly, we "accept[] as true all factual allegations [in the complaint but are] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" Detroit Gen. Ret. Sys., 621 F.3d at 804 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Additionally, "[t]he complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" Id. at 805 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## IV. Substantive Consolidation

## A. General Powers Under Section 105(a)

Substantive consolidation is an equitable remedy grounded in the broad powers of 11 U.S.C. § 105(a), which allows the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a); see also Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 218–20 (1941) (granting indirect approval for the remedy known today as a substantive consolidation). Substantive consolidation allows the court, in appropriate situations, to expand the definition of the debtor's bankruptcy estate to include additional assets also within debtor's possession and control. Accordingly, the remedy combines the consolidated entities' assets and liabilities to satisfy creditors from a combined pool of assets. See In re Owens Corning, 419 F.3d 195, 205–09 (3d Cir. 2005).

Our court recognizes the bankruptcy court's authority to substantively consolidate debtor entities. See In re Giller, 962 F.2d 796, 799 (8th Cir. 1992). In Giller, we affirmed a bankruptcy court's decision to substantively consolidate six Chapter 11 debtors, all of which shared a common sole or majority shareholder, based on the bankruptcy court's finding of (1) abuse of the corporate form and (2) transfers among the debtors that could "give rise to fraudulent conveyance and preference causes of action." Id. at 798. Given the facts in Giller, we found the equitable remedy of substantial consolidation to be the "only hope" of recovery for the unsecured creditors. Id.

A number of other courts also recognize the substantive consolidation of multiple debtors. See generally Owens Corning, 419 F.3d at 205 (3d Cir. 2005); F.D.I.C. v. Colonial Realty Co., 966 F.2d 57, 58 (2d Cir. 1992); In re Auto-Train Corp., 810 F.2d 270, 276 (D.C. Cir. 1987). As substantive consolidation requires the creditors of one entity to share equally with the creditors of a potentially less solvent entity, unfairly disadvantaging some creditors' recovery, there is broad consensus that

substantive consolidation is an "extraordinary remedy, " <u>Owens Corning</u>, 419 F.3d at 199 (quoting <u>In re Augie/Restivo Baking Co.</u>, 860 F.2d 515, 518 (2d Cir. 1988)), to be "invoked 'sparingly,'" <u>id.</u> at 209. <u>See also</u> <u>Colonial Realty Co.</u>, 966 F.2d at 61; <u>Augie/Restivo Baking Co.</u>, 860 F.2d at 518 (stressing that "substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights" (omission in original) (citations omitted)). Although the circuits differ as to the precise test to determine the appropriateness of the remedy, there is general agreement the determination must be made on a "case-by-case basis" after a "searching review of the record" as the bar for granting the remedy is set high. <u>Colonial Realty Co.</u>, 966 F.2d at 61; <u>see also</u> <u>Auto-Train Corp.,</u> 810 F.2d at 276.

So far, only the Ninth Circuit appears to have directly addressed the substantive consolidation of debtors with non-debtors. <u>See</u> <u>In re Bonham</u>, 229 F.3d 750, 769–71 (9th Cir. 2000) (allowing the substantive consolidation of debtor and non-debtor entities after finding debtor commingled personal assets with non-debtor entities and failed to maintain corporate distinctions between debtor and non-debtor entities). No appellate court has recognized the substantive consolidation of a debtor and a *non-profit* non-debtor, let alone a debtor and *over 200* non-profit non-debtors.

Therefore, before reaching the merits of the bankruptcy court's substantive consolidation determination, we must first decide if the court has the authority to substantively consolidate Debtor with over 200 affiliated non-profit non-debtors.

### B. Non-Profit Non-Debtor Rights Under Section 303(a)

As a general rule, "a bankruptcy court may not contravene specific statutory provisions" of the Bankruptcy Code. <u>Law v. Siegel</u>, 134 S. Ct. 1188, 1194 (2014). Thus, the broad, catch-all equitable powers conferred under 11 U.S.C. § 105(a) do not allow a bankruptcy court to "override explicit mandates of other sections of the Bankruptcy Code." <u>Id.</u> (citation omitted).

With this in mind, the bankruptcy court turned to 11 U.S.C. § 303(a), which provides:

> [a]n involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.

11 U.S.C. § 303(a). Although the statute itself does not explicitly define a "corporation that is not a moneyed, business, or commercial corporation," the plain and ordinary meaning is the equivalent of "non-profit" or "not-for-profit" corporation. For further guidance, the bankruptcy court turned to the legislative history to illuminate the types of entities the legislature intended § 303(a) to protect:

> "[t]he exceptions contained in current law that prohibit involuntary cases against farmers, ranchers and eleemosynary institutions are continued. Farmers and ranchers are excepted because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy. *Eleemosynary institutions, such as churches, schools, and charitable organizations and foundations, likewise are exempt from involuntary bankruptcy.*

S. Rep. No. 95-989, at 32 (1978) (emphasis added).

Black's Law Dictionary defines eleemosynary as "[o]f, relating to, or assisted by charity; not-for-profit." Black's Law Dictionary (10th ed. 2014). Under eleemosynary corporation, the dictionary states, "[s]ee charitable corporation," which is defined as "[a] nonprofit corporation that is dedicated to benevolent purposes and thus entitled to special tax status under the Internal Revenue Code." Id. Additionally, in the legislative history, the term "eleemosynary institutions" is followed by "such as churches, schools, and charitable organizations and foundations," providing a non-exhaustive list of organizations included under § 303(a). S. Rep. No. 95-989, at 32.

-10-

We agree with the bankruptcy court's interpretation that "not a moneyed" is equivalent to the modern-day terms "not-for-profit" or "non-profit." To determine whether the Targeted Entities are classified as non-moneyed or non-profit organizations, we turn to state law. See First Am. Bank & Trust Co. v. George, 540 F.2d 343, 346 (8th Cir. 1976) (noting "the courts have traditionally made reference to the applicable state laws to determine" the entity's classification); see also In re Yehud-Monosson USA, Inc., 458 B.R. 750, 755 (B.A.P. 8th Cir. 2011) ("In the Eighth Circuit, the test for whether a debtor is a moneyed, business, or commercial corporation is determined by a consideration of the classification of the corporation by the state; the powers conferred upon it; and the character and extent of its main activities." (citation omitted)).

Here, the Targeted Entities are included in the definition "not a moneyed, business, or commercial corporation" of § 303(a). There is no dispute as to the religious organization and non-profit status of the Targeted Entities under Minnesota law. See Minn. Stat. Ann. § 315.15; see generally Minn. Stat. Ann. § 315.

After establishing the Targeted Entities are non-moneyed corporations and organizations, the bankruptcy court determined that granting the motion for substantive consolidation, over the objections of the Targeted Entities, would necessarily pull non-profit entities into bankruptcy involuntarily in contravention of § 303(a). Therefore, the bankruptcy court decided it did not have the legal authority to substantively consolidate Debtor and Targeted Entities, because to do so would override an explicit statutory protection in the Bankruptcy Code. We agree. Section 303(a) prevents the use of § 105(a) to force truly independent non-profit entities into involuntary bankruptcy.

We leave for another day the issue of whether a non-profit non-debtor that is the alter ego, under state law, of the debtor, or has been formed as part of a fraudulent scheme, such as a Ponzi scheme, can be consolidated. The Committee has not argued an alter ego theory here. At most, the Committee alleges facts which, taken as true,

-11-

indicate that there had been isolated incidents of failures to follow corporate formalities and an occasional transfer of assets.[4] The Committee couples those examples with the argument that the Archbishop has virtually unfettered control of the non-debtor entities through his membership on each board of directors and his ability to appoint and remove the other directors.

We cannot conclude on the facts as alleged in the complaint that these allegations overcome the express prohibition of § 303(a) against an involuntary bankruptcy of non-debtor non-profits. The isolated incidents of lack of corporate formality and commingling of assets fall far short of the requirement for alter ego status under Minnesota law. See Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal, 516 F.3d 719, 729 (8th Cir. 2008) (citation omitted); Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979) (establishing the test for alter ego). Moreover, as previously discussed, the Archbishop's effective control over the corporations is a function of the Minnesota Statutes governing the operation of religious organizations. Minn. Stat. Ann. §§ 315.01–.51. The Committee's arguments would apply to virtually any non-profit organization incorporated under the Minnesota Statutes and would effectively nullify the protections of § 303(a).

The Committee argues that we are only at the motion to dismiss stage and that further discovery could possibly result in additional evidence of financial and other entanglements between Debtor and the Target Entities. However, Iqbal requires sufficient factual allegations "to state a claim that is plausible on its face." 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). Even assuming an alter ego theory or fraud would apply in the § 303(a) context, the sparse facts alleged in the complaint fall short of the Iqbal standard. We also note the discovery concern is lessened to a

---

[4]These allegations are made against only a handful of the more than 200 Targeted Entities. No allegations of any kind are made against the vast majority of the Targeted Entities.

significant extent in a Chapter 11 bankruptcy case. The consolidation motion is only one part of the larger bankruptcy case. Bankruptcy Rule 2004 gives all creditors broad discovery rights to inquire into the financial affairs of the debtor, as well as relevant non-parties, as part of the main Chapter 11 case, which has now been pending for several years.

We understand the Committee's sincere attempts at recovery for a class of creditors who have suffered greatly by clergy abuse. However, global consolidation of all entities in the Archdiocese is not authorized by the Bankruptcy Code. There are remedies available in the Bankruptcy Code to address specific abuses by Debtor or other entities, if they exist. Substantive consolidation of all related entities, however, is not one of those remedies.

Accordingly, we affirm the judgment of the district court.

———————————————————